HENRY WALLACE, Appellee, v. THE HOMESTEAD COMPANY AND JAMES M. PIERCE, Appellant.

Libel: MITIGATION: Current rumors and reports. Defendants in a suit for libel purporting to be published on their own knowledge, and not on information and belief, cannot show, in mitigation of damages, that the libelous statements were mere publications of current rumors or reports.

JUSTIFICATION: Held not broad enough. An answer in a libel suit alleged that plaintiff, who was the owner of a newspaper,

and claimed to be the leading exponent of antimonopoly, agreed with the Republican campaign managers, in consideration of the purchase by the latter of large numbers of his papers as campaign documents, to pretend in his paper to make an impartial investigation, and to write a series of articles advocating the gold standard, as the conclusion reached in such pretended impartial investigation, which agreement was carried out. · *Held* not sufficient to show a justification of the alleged libel, which charged that plaintiff had become noted as a bribe taker, and had received more than $1,000 in cash for reaching a conclusion in an investigation claimed to be impartial, because the justification, not alleging a bribe, was not as broad as the libel.

LIBEL PER SE: *What is not.* A publication that the writer withdrew from a certain paper by reason of troubles with the business manager as to its editorial policy, the writer wishing to maintain the paper in its old position as the leading Western exponent of antimonopoly principles, and asking support for a rival journal of which he has become editor, is not per se libelous as to the business manager, within the meaning of Code, section 5086, defining libel as the malicious defamation of a person, made public by any printing tending to provoke him to wrath, to expose him to public hatred, contempt, or ridicule, or to deprive him of the benefits of public confidence or social intercourse; as the language is to be construed in its ordinary meaning, and cannot be construed· as charging any wrong on the part of the business manager.

*Libel per se not to be made by innuendo.* A publication which is not per se libelous cannot be made so by innuendo, the purpose of the latter being merely explanatory of a subject-matter sufficiently expressed before, and not to extend the sense of the publication.

Contract of Settlement: CONSTRUCTION: *Ejusdem generis.* Plaintiff and defendants in libel were owners of various newspapers, and had serious difficulties and much litigation between themselves in reference thereto. On the day of the publication of the libel, and while a number of such suits were pending, they entered into an agreement, which recited the difficulties, and that the parties had completed preliminary negotiation in reference to settling them, and had formulated a statement of the properties affected and controversies proposed to be settled. The contract provided that for a certain consideration the plaintiff should sell to defendants all his interest in the newspapers and all interest in property owned by such newspaper companies, and that it should constitute a settlement of all

suits, matters in controversy, differences, and claims of every character between the parties, and between plaintiff and the several newspaper companies, and the officers and stockholders thereof.   It was further provided that the plaintiff should release all claims against any of said persons growing out of the differences referred to, and it was further stated that it was the purpose to acquire all of plaintiff's interest in the papers, and to settle all the controversies in any way grown out of the differences between the parties as to the affairs of the newspapers, and that it should include all such controversies, whether designated in the contract or not.  *Held*, that the contract, construed as a whole, in view of the rule of *ejusdem generis*, did not operate as a settlement of the libel suit, it appearing from the contract that such was not the intention of the parties.

*Appeal from Polk District Court.*—HON. S. F. PROUTY, Judge.

SATURDAY, MAY 31, 1902.

ACTION for libel.   Verdict and judgment for plaintiff, and defendants appeal.—*Affirmed.*

*N. T. Guernsey* for appellants.

*Carr & Parker* and *Cummins, Hewitt & Wright* for appellee.

DEEMER, J.—The petition, which is in two counts, is based upon alleged libelous publications printed in an agricultural paper known as the "Homestead" in its issue of October 8, 1897, and a second publication of practically the same matter in an issue of February 18, 1898.   The first publication reads as follows:  "The task of watching the test on behalf of the swine-growing interests of the West and vouching for the results is one to which the strictest impartiality should be summoned.   It is therefore much to be regretted, in view of the importance of the subject to those interests, that it should be delegated to a gentleman who in a previous 'impartial investigation' had become noted as a bribe taker.   Within very

recent memory he undertook an impartial investigation of an important question, pretending that he did not know where it would lead him, when he in fact received more than $1,000 in cash for reaching a conclusion at which he had privately agreed from the outset he would arrive. In the present investigation his name appears in the daily press of Des Moines for all the free advertising possible, and he at the same time pretends to a judicial attitude that will serve to add to the commercial value of his personal indorsement should he finally decide it to be safe to give one. Such personal indorsement, however, will be wholly worthless; for one who undertakes an alleged impartial investigation, and at the same time accepts a bribe for reaching a prearranged conclusion in it, cannot repeat the deception every year. The farmer may have a short memory, but it is not short enough for that. Our suggestions to Western swine growers, therefore, is that they pay no attention to this piece of hog cholera cure exploitation regarding a remedy, which, so far as the results attained show, is hardly up to those reached by a dozen or more well-known remedies for the same purpose." The defendant pleaded a settlement, justification, privilege, and certain matters in mitigation which will be hereinafter referred to. On the issues as they were finally formed the case was tried to a jury, resulting in a verdict and judgment for plaintiff. Appellants rely for a reversal on certain rulings of the trial court with reference to the issue of settlement, to the defendant's plea in mitigation, to motions to strike the plea in justification, and to a counterclaim pleaded by defendants. These matters will be disposed of in the order stated, and first the matter of settlement.

I. It appears that prior to the first publication complained of, plaintiff, defendant James M. Pierce, and one Stewart, who were the owners of the Homestead and other properties, had had difficulties regarding the management

of these properties, and were involved in a great deal of litigation. Some of these cases reached this court. See 101 Iowa, 313. At the time the first libel was published there were 15 or more suits pending, in which these parties, or some of them, were interested, either as plaintiffs or defendants. On the day of the publication these parties entered into a preliminary agreement of settlement and compromise, which was fully consummated on November 10, 1897, after an additional agreement had been entered into on October 29th of the same year. Defendants contend that these agreements and settlements fully discharged and released them from all liability on account of the alleged libel set forth in the first count of the petition. They rely upon the following excerpts from said agreements, which are too long to be set out in extenso:

"Basis for the proposed agreement between Henry Wallace on the one part and James M. Pierce and Samuel F. Stewart on the other part for the sale by said Wallace to said Pierce and Stewart of the entire interest of said Wallace in the Homestead Company and the Pierce-Wallace Publishing Company and the corporations connected therewith, and the undivided half of the real estate owned jointly by the said Pierce and Wallace, and for the settlement of all matters of controversy, whether suit has been brought on same or not, which have in any wise, directly or indirectly, grown out of or been caused by the differences between said Wallace and the Homestead Co., the Pierce-Wallace Publishing Co., and the officers and stockholders of said companies. * * * Fourth. All claims of every kind and character whatsoever, whether heretofore asserted by suit or otherwise, held by said Wallace or the Wallace Publishing Company against the said Pierce, Stewart, Homestead Company, Pierce-Wallace Publishing Co., Wisconsin Farmer Company, Indicator Publishing Company, or either of them, or against any officer or stock-

holder in said companies, or either of them, and all other claims, if any, of the said Wallace growing out of the differences above referred to shall be satisfied, released, and discharged by said Wallace; and said parties shall each of them release and satisfy all claims held by them or either of them against said Wallace, so that the settlement herein contemplated shall operate to compromise and forever set at rest all matters of difference at present existing between said parties. Said settlement shall be evidenced by the exchange of proper written instruments duly executed by the respective parties." "Sixth. It is the purpose of this agreement to consummate the purchase by said Pierce and Stewart of the entire interest of said Wallace in the Homestead Company and allied properties, as well as in the real estate above described, and to compromise all controversies which have in any way grown out of the differences between the said parties, Pierce, Wallace, and Stewart as to the affairs of the Homestead Company and allied properties, and all such controversies shall be deemed to be included in and settled by this contract, whether herein specifically mentioned or not, so as to fully adjust all outstanding matters which have arisen out of said controversies." On the other side it is contended that these stipulations and agreements had no reference whatever to the alleged libel; that they related only to business differences which then existed between the parties, and that the purpose and intent of the agreement was to reach and adjust these differences; and plaintiff relies on substantially the same provisions, claiming that they distinctly show that the compromise, was of controversies which in any manner grew out of the differences between Pierce, Wallace, and Stewart as to the affairs of the Homestead Company and allied properties, and nothing else, and this further provision of these agreements: "Whereas, James M. Pierce, of Des Moines, Iowa, and Samuel F. Stewart, of Evantson,

Ills., are negotiating with Henry Wallace, of Des Moines, Iowa, for the purchase of certain property, and for the adjustment and settlement of certain differences between themselves and others, and for the settlement of a number of pending suits; and whereas, the parties have completed certain preliminary negotiations with reference to the said matters, by which they have formulated a statement containing a description of the property which is made the subject of said negotiations, and setting out the controversies which it is proposed to settle and compromise, and fixing the manner in which the said transaction is to be completed in the event that the parties agree upon the consideration to be paid by the said Pierce and Stewart to the said Wallace: Now," etc. Looking to the purpose of the agreement as expressed in the instruments themselves, and applying the generally accepted canons of construction thereto, we think it fairly appears that there was no thought of the parties that they were making settlement of the alleged libel. These rules of construction may be stated as follows: "One of the rules of interpretation most frequently referred to is to the effect that the intention must be determined by a consideration of the whole instrument, rather than by any clause; the theory being that the parties presumably had the same purpose and object in view in all parts of the instrument; and, consequently, if some of the stipulations are more obscure than others, or one part is seemingly inconsistent with another, the main purpose and object as collected from the whole instrument may be so clear and distinct as to throw light upon some obscure or inconsistent parts." Again: "This principle receives an important application in the rule of *ejusdem generis*, according to which general words following words of a more particular character are regarded as limited in their meaning by the former. This rule is, however, as are practically all the rules of construction, subordinate to the requirement that the intent of the parties is

to be chiefly sought, and will, of course, not apply if the intent appears to be otherwise. General words preceding other words that are particular in meaning are likewise on the same principle limited by the particular words, unless the intention appears to be otherwise." 17 Am. & Eng. Enc. Law (2d Ed.)pp. 4, 6, and cases cited. There was, as it seems to us, no thought in the minds of the parties that they were settling any claims for libel. As the article was printed the same day on which the preliminary agreement was made, it is hardly to be believed that the parties had it in mind to settle any claims for damages for libel by the use of such statements as appeared in these agreements.

II. The defendant's plea in mitigation of damages was as follows: "That there was at the time that the said alleged libel was published, and for a long time had been, general rumors current throughout the farming community in the state of Iowa and elsewhere, which were well known to the said class and its representatives throughout the said state, to the effect that the plaintiff had, during the political campaign of 1896, been induced to abandon what had heretofore been his views upon the financial question then pending, and to adopt and advocate the views of those who favored the single gold standard, in consideration of the purchase by the Republican party of a large number of sample copies of the said paper for distribution as campaign documents, and that the defendants heard these general rumors, and believed the same to be true. For further pleas of mitigation of damages these defendants respectfully show to the court that they were, prior to the publication of the said libel, informed by various public men of Iowa, including persons then and now prominent in the Repubilcan party politics in the said state, that the arrangement hereinbefore set out had been made between the plaintiff and the representatives of the said party, and that these defendants believed that the said statements were true; that the alleged.

libel was published in reliance upon the said information, and in the belief that the statements therein contained were true, and without malice." On motion these divisions of the answer were stricken out, and of this the defendants complain. Their proposition is that these matters were proper to be shown in mitigation, not of actual, but of exemplary, damages. They rely on *Kansas·City Star Co. v. Carlisle*, 47 C. C. A. 384 (108 Fed. Rep. 344); *Reiley v. Timme*, 53 Wis. 63 (10 N. W. Rep. 5); *Hearne v. De Young*, 119 Cal. 670 (52 Pac. Rep. 150); *Storey v. Early*, 86 Ill. 461; *Witcher v. Jones*, 43 N. Y. St. Rep. 151 (17 N. Y. Supp. 491; *Evening Post Co. v. Hunter*, 18 Ky. Law Rep. 726 (38 S. W. Rep. 487); and other like cases. Few, if any, of these cases squarely decide the question before us. The rule announced by the great weight of authority is to the effect that, where the alleged libel does not, on its face, purport to be published on the authority of others, but of defendants' own knowledge it cannot be shown in mitigation of exemplary damages that it originated with another. Newell, Defamation (2d Ed.) p. 894, and cases cited; *Marker v. Dunn*, 68 Iowa, 720; *Clifton v. Lange*, 108 Iowa, 472; *Mapes v. Weeks*, 4 Wend. 663; *Clark v. Munsell*, 6 Metc. (Mass.) 388; *Pease v. Shippen*, 80 Pa. 513 (21 Am. Rep. 116); Townsend Slander & Libel, section 411, and cases cited, among them being *Bearsley v. Bridgman*, 17 Iowa, 290, which is more or less in point. Defendants admit this is the rule as to actual damages, but claim that it does not apply where exemplary damages are claimed. While there are a few cases which seem to so hold, we are committed to a contrary doctrine (see cases hitherto cited); and our holdings seem to have support in the majority of the decisions (Newell, Defamation [2d Ed.] p. 901; *Stow v. Converse*, 4 Conn. 17, and cases heretofore cited). We have expressly held that such matters cannot be considered in mitigation of damages, and in the cases so holding both actual and

exemplary damages were claimed. See *Marker v. Dunn*, and *Clifton v. Lange, supra*. Some of the cases seem to hold that, if the rumors or reports are so general and prevalent that they have affected plaintiff's general character, they may be shown in evidence, not for the purpose of negativing defendant's malice, but as mitigating plaintiff's damages. 3 Sutherland Damages (2d Ed.) section 1226; *Bowen v. Hall*, 20 Vt. 232; *Gilman v. Lowell*, 8 Wend. 579, (24 Am. Dec. 96); *Matson v. Buck*, 5 Cow. 500; *Proctor v. Houghtaling* 37, Mich. 41; *Wilson v. Fitch*, 41 Cal. 363. This distinction has not been noticed in some of the cases, but we believe it to be sound. Recognizing this rule, the trial court gave the following, among other instructions: "The defendants have stated in their answer, by way of mitigation that the plaintiff, prior to the publication of the articles complained of, had the reputation of being guilty of the matters and things charged in said articles, and that said defendants had knowledge of such facts at the time of publishing the articles complained of. Upon the defendants rests the burden of establishing such fact. The law presumes every man to have a good reputation until the contrary appears, and before you can consider said matters in mitigation it must be established by a preponderance of the evidence that plaintiff had such reputation prior to the time of the publication of the articles complained of. The defendants would not be entitled to claim any mitigation on account of said reputation if you find that said reputation was caused by the prior publication or statements by defendants. But if you find that prior to the pubilcation of the articles complained of plaintiff had a reputation of being guilty of matters and things charged in said articles, and said reputation was not caused by the publications and statements of defendants, then you will take the same into consideration in determining the amount of damages to which plaintiff will be entitled, but you will not consider said evidence for any other

purpose. Such fact, if you find it to be a fact, is no defense to this action, and should be given weight by you only in determining the amount of damages which the plaintiff has suffered." There was no error in the rulings on the motion of which defendants may justly complain.

III.    The third division of the answer was as follows: "These defendants aver: That the said statements were not made in the sense, nor had they the meaning, which is attempted to be given to them as alleged in the petition herein, but aver that they are explained and the true meaning of the said statement is made plain by the remainder of the article of which the extract quoted in the first count of the petition herein is a part, as will appear from the said entire article, which is attached hereto as Exhibit D, and made a part hereof. That the Homestead Company is, and for nearly forty years last past has been, the publisher of the Homestead, which is a weekly agricultural nonpartisan newspaper, devoted to the discussion of matters of importance to the farming community, which newspaper has attained and maintained the position of the leading Western exponent of antimonopoly principles. That at the date of the publication of the alledged libel, and for many years prior thereto, the farmers of the Western states had been deeply interested in the disease known as hog cholera, and in the discovery of a remedy that would prevent or cure it, and that many worthless nostrums had been foisted upon them by representations that they would either cure or prevent the said disease. That the said farmers expected the said Homestead, as their representative, to inform them as to any remedies which might be suggested for the said disease, and to advise them as to their reliability, and that it was the duty of the Homestead to so do. That at the time the said alleged libel was published there was pending an investigation with reference to a new so-called remedy for hog cholera, in which investigation the plaintiff assumed

to act as one of the judges. That theretofore, to wit, during the campaign of 1896, the farming community, especially in the western states, had been deeply interested in the financial question that was involved in the said campaign, the question being whether they should favor the party which advocated the gold standard or whether they should favor the party which advocated the double standard and the free coinage of silver at the ratio of sixteen to one. ·That in his personal views the said Wallace had theretofore for a long time been an advocate of the double standard. That during the said campaign the said Wallace entered into an agreement with a prominent representative of the Republican party by which he undertook and agreed that he would, in the newspaper of which he was then the editor, to wit, Wallace's Farmer, advocate the single gold standard, and by which he further agreed that, while advocating the single gold standard, he would announce in the said paper that what he proposed to do was to proceed to an impartial investigation of determining in advance what the conclusion should be, so that when the conclusion which was agreed upon in advance was reached, viz., that the parties who advocated a single gold standard were right upon this question, it would carry with it more force because of an impartial investigation; and that at the same time, as a part of the said agreement, the said plaintiff agreed that he would advocate and champion the gold standard side of the said question in the manner above set out, and that he would refuse to publish or permit to be published in his paper communications advocating the opposite views. That the said arrangement was made in consideration of an agreement upon the part of the party to which the reference has been made to purchase a large number of sample copies of the paper containing this so-called impartial investigation for distribution as campaign documents. That pursuant to the said agreement the said plaintiff wrote, composed, and printed, and

caused to be published in his said paper, the series of articles contemplated thereby, and in consideration therefor there were sold during the period the said articles were being published—that is, during the months of August, September, and October, 1896 — sample copies aggregating about ——, the said sample copies being sent out at the respective dates and in the numbers shown by the following table, to wit:

| Date of Issue. | Legitimate Subscription. | Sample Copies. | Total Circulation. |
|---|---|---|---|
| July 3. | 1,500 | 5,500 | 7,000 |
| July 10. | 1,500 | 5,500 | 7,000 |
| July 17. | 1,500 | 5,500 | 7,000 |
| July 24. | 1,500 | 5,500 | 7,000 |
| July 31. | 1,500 | 5,500 | 7,000 |
| Aug. 7. | 1,500 | 5,500 | 7,000 |
| Aug. 14. | 1,500 | 5,500 | 7,000 |
| Aug. 21. | 1,500 | 18,500 | 20,000 |
| Aug. 28. | 1,500 | 18,500 | 20,000 |
| Sept. 4. | 1,500 | 18,500 | 20,000 |
| Sept. 11. | 1,500 | 18,500 | 20,000 |
| Sept. 18. | 1,500 | 18,500 | 20,000 |
| Sept. 25. | 1,500 | 18,500 | 20,000 |
| Oct. 2. | 1,500 | 18,500 | 20,000 |
| Oct. 16. | 1,500 | 18,500 | 20,000 |
| Oct. 23. | 1,500 | 18,500 | 20,000 |
| Oct. 30. | 1,500 | 18,500 | 20,000 |
| Nov. 6. | 1,500 | 5,500 | 7,000 |
| Nov. 13. | 1,500 | 5,500 | 7,000 |

"That the said alleged libel means, when considered in its ordinary sense, that the plaintiff having heretofore professed to attempt an impartial investigation, through the newspaper of which he was editor, of a matter of interest to the class of whom he professed to be the representative, had in fact not made an impartial investigation, but had allowed himself to be influenced in the conclusions reached by him for the benefit that would accrue on account of such determination, and that this would tend to discredit any subsequent investigation which he might attempt. And these defendants respectfully show to the

court that the said charges were true and are true, and were printed and published in good faith, believing them to be true, in the performance of what these defendants believed to be their duty to the farmers who are the constituents of the Homestead, and without malice."

Exhibit D attached is of no particular consequence, and we do not set it out. It is sufficient to say that there is nothing therein which justified the charge made in this division of the answer. This third division was stricken out on motion, and of this defendants complain. The matter was pleaded in justification. It is manifest, we think, that the justification is not as broad as the charge, and that the ruling was correct. *Sheehey v. Cokley*, 43 Iowa, 183. The justification must be as broad as the charge, and of the precise charge. It need not be in the exact form of the charge, but it must be, in essence and substance, the same. These propositions are so well settled that no citation of authorities is needed in their support. With these rules in mind, it is apparant that the justification was not sufficient, and that there was no error in the court's ruling. *Stow v. Converse, supra*; *Youngs v. Adams* 113 Mich. 199 (71 N. W. Rep. 585). The answer does not allege that plaintiff accepted a bribe, much less a cash bribe. That our position may not be misunderstood, we quote from the opinion written by Hosmer, C. J., in the *Stow Case, supra*: "It has been correctly asserted that proof of the substance of a slanderous charge is a justification, and this is frequently followed by the erroneous supposition that everything is substance which justifies the matter alleged, or has a relation to the facts averred, although it does not meet them directly. In a case which demands the frequent application of the exact rule on this subject it is of high importance that it should be precisely understood. The term 'substance' issued by the way of contradistinction from the letter and form of a charge; and, although the latter is not required, the essence is indispensable. It can never com-

port with private justice or public convenience that a libeler should be protected by any proof which falls below the imputations he has made. The characters of men would be most inadequently guarded by a principle that permits anything to be a justicfiation of libelous expressions not amounting to full proof of the essential facts· charged; and .a court which, in' its requirements, should sink below this standard, would deserve nothing short of public censure. And when the accusation, instead of specifying certain definite facts, which are clearly to be understood, and to confront which the person claiming to be injured knows by what testimony to meet them, is expressed in terms so broad and general as almost to defy preparation for this purpose, the rule cannot, with safety to the interests of justice, admit of any relaxation. Were it otherwise, the press, which now often teems with gross licentiousness, might easily be made the vehicle of the most wanton reproach and vile calumny, without the possibility of correction; and this palladium of liberty would thus become a hateful curse." In *Andrews v. Vanduzer*, 11 Johns. 38, it is said: "The defendant who would justify a charge must justify as to the charge laid, and cannot set up a charge of the same thing, but distinct as to the subject-matter."

IV. Defendants filed a counterclaim based upon the publication by plaintiff of an article which he is said to have written of and concerning the defendants as follows: "Mr. Wallace was for ten years, up to February, 1895, the editor of the Iowa Homestead. His withdrawal from the paper was the culmination of trouble between him and the business manager as to its public editorial policy; Mr. Wallace wishing to maintain it in its old position as the leading Western exponent of antimonopoly principles. Failing in this, he became the editor of Wallace's Farmer, over the editorial policy of which he has full control. He invites the co operation of his old

Homestead friends in making the Farmer and Dairyman the leading Western authority on agricultural matters." The innuendo was as follows: "These defendants further allege that the aforesaid libel was so composed, written, published, and circulated by the plaintiff of and concerning said defendant Pierce in the following defamatory sense, to wit: It was intended by the plaintiff thereby to charge that the defendant Pierce, in the management of the business of said corporation and paper, while professing and claiming to support and indorse the antimonopoly principles of the readers of said Homestead, was in truth and in fact not sincere in said support, and was guilty of bad faith and treachery to the subscribers and readers of said paper, and the public generally; and that the said Pierce's pretentions, through the columns of said paper, in support of the antimonopoly principles of the subscribers and patrons, were false and untrue, insincere and dishonest, and that the utterances of said paper, as controlled by said Pierce, upon antimonopoly questions were, for said reason, not entitled to the respect and confidence of the patrons of the paper and the public generally." A libel is the malicious defamation of a person made public by any printing tending to provoke him to wrath, or expose him to public hatred, contempt, or ridicule, or to deprive him of the benefits of public confidence or social intercourse. Code, section 5086. Defendants alleged no special damages, and the sole question is whether or not the language used is actionable *per se.* This must be determined from the language used as applied to the situation of the parties. An innuendo is not an averment, but only matter of explanation. It means nothing more than the words "*id est*" "*scilicet,*" or "meaning," or "aforesaid," as explanatory of a subject-matter sufficiently expressed before; as such a one, meaning the defendant, or such a subject, meaning the subject in question. An innuendo cannot extend the sense of the expressions in the

alleged libel beyond their own meaning. Where the words used are ambiguous or admit of different applications, an innuendo may confine or direct them, but cannot extend the intendment of an expression beyond the customary meaning. If this were not true an explanation of antecedent matter would be converted into a direct averment. The words themselves, in the absence of ambiguity, must be taken in that sense in which they would naturally be understood by those who heard and read them. What, then, is the plain and popular sense of the words used, and what was the imputation meant to be conveyed? It alleges that plaintiff had been editor of the Homestead; that he had withdrawn because of trouble between himself and the defendant as to its editorial policy; that plaintiff wished to maintain it in its old position as the leading exponent of antimonopoly principles; that he failed in this, and became the editor of another paper, over the editorial policy of which he had full control; and that he invited the co-operation of his old Homestead friends in making his paper the leading authority on agricultural matters. There is no charge of bad faith on the part of the defendant; no claim that he changed his views, or that, if he did, that his change was not an honest one; no imputation of any wrong on the part of the defendant, nor any claim that he was not maintaining the principles which he had formerly advocated. True, it asserts that Wallace wished to maintain the paper as the leading exponent of authority on antimonopoly principles, and that he failed to do so on account of his trouble in so doing, which may be said to mean that defendant was not in favor of this; but there is no charge of any change in his (defendant's) views, and nothing which in any way tended to injure defendant in his trade or business. Dishonesty is not charged, nor is there anything in the publication which charges bad faith on the part of the defendant.

Further argument is useless. From what has already been said we do not regard the publication libelous *per se.* This disposes of all matters argued by counsel, and, as we find no error, the judgment is AFFIRMED.