Argued December 18, 1935; reversed January 14, 1936

# ISRAEL *v.* PORTLAND NEWS PUBLISHING COMPANY

(53 P. (2d) 529)

*Harold J. Warner* and *Wilber Henderson,* both of Portland (S. S. Hahn, of Los Angeles, California, on the brief), for appellant.

*O. A. Neal,* of Portland (William S. Shenker, of Portland, on the brief), for respondent.

CAMPBELL, C. J. This is an action for damages brought by plaintiff, Mark M. Israel, against defendant, the Portland News Publishing Company, a corporation, based on an alleged libel published in defendant's newspaper, a newspaper of general circulation, published in Portland, Oregon.

The case was tried before a jury which returned a verdict in favor of defendant. Thereafter plaintiff seasonably moved the court for an order setting aside the verdict and judgment and granting a new trial, assigning several grounds as the basis therefor. The court granted the said motion and ordered a new trial, and it is from that order that defendant appeals.

On November 21, 1933, W. Frank Akin was found shot to death in his apartment in Portland. He was a public accountant and had been employed as a special investigator. At the time of his death, he was investigating the fiscal affairs of the Port of Portland on

behalf of the governor of Oregon. Wide-spread publicity throughout the state was given by the press to the mysterious slaying. The identity of Akin's slayer or the motive for the slaying has not been determined up to the present time.

Various theories as to the motive for the murder and the identity of the slayer were advanced, one of which was made public by the plaintiff herein in an interview with a sergeant of the state police in the presence of a newspaper reporter of the Morning Oregonian, a newspaper of general circulation, "covering the whole Northwest", published in Portland, Oregon. The newspaper account of the interview was published in the Morning Oregonian on November 23, 1933, and, omitting the head lines, is as follows:

"Traces of 'another woman' in the W. Frank Akin murder mystery were revealed yesterday in a startling story unfolded to state police by Mark M. Israel, jeweler and loan broker, of 2034 Northeast Twenty-first avenue.

The lengthy statement made by Israel to Sergeant S. C. Linville at state police offices provided authorities with the first tangible motive for the slaying of Akin, who was found shot to death in his living quarters at the Arbor Court Apartments, 1329 Southwest Fourteenth avenue, about 9 A. M. Monday morning.

Israel, who said Akin had checked his books and made out his income tax reports for about four years, told Linville that the murdered man had told him on a number of occasions that a woman, with whom he had an affair, had repeatedly threatened his life.

#### AKIN AFRAID OF WOMAN

'I talked with Akin lots of times,' Israel said, 'and he told me about his woman and added that the only reason he kept seeing her was that he was afraid she would kill him. He said she had threatened to do so a number of times and on several occasions went so far as to point a gun at him.'

Continuing his sensational narrative, Israel said that Akin had informed him that about five years ago he (Akin) had taken the woman on an automobile trip through the Grand Canyon. On their return to Portland, Akin's alleged paramour told him she would prefer a Mann Act charge against him if he ever deserted her, Israel said.

### STORY HEARD OFTEN

'He confided in me often when he used the balcony of my store, the Century Loan & Jewelry Company, at Third and Washington streets, for an office. After this affair had lasted some time, Akin told me that he had confessed his infidelity to his wife and offered to give her a divorce. Mrs. Akin, I was told forgave her husband, but told him that he could leave with the other woman any time he desired.'

### NAME NEVER HEARD

'I know he went around armed,' the jeweler related, 'because I gave him shells for the weapon several times.'

In all of these asserted conversations, Akin never once mentioned the name of the woman, always referring to her as 'my girl' or 'her'.

Mrs. Akin previously had emphatically denied that any woman had entered her husband's life since their wedding and added that their married life had been exceptionally happy. Mrs. Bertha Goul, the dead man's sister, who was present at the time Mrs. Akin made the above assertions, amplified the statements by saying the couple had always been considered ideal mates and seldom if ever had any disagreements.''

On the morning of November 23, the editor of defendant's newspaper, after reading the above article, directed one Miss Katherine Anderson, one of the reporters of defendant's newspaper, to contact the widow of Akin and ascertain what information could be garnered from her as to the truth or falsity of the aforesaid article.

On the same day, Miss Anderson got in touch with Mrs. Akin by telephone. After conversing a few minutes, due to her recent bereavement, Mrs. Akin was unable to continue the conversation, and one Mrs. Bertha Goul, Mr. Akin's sister, communicated the rest of Mrs. Akin's statement to Miss Anderson. Miss Anderson thereupon wrote the following story, based on the statement of Mrs. Akin, which was published in the second edition of defendant's paper on the same day:

"AKIN'S WIDOW FLAYS GOSSIP
BRANDS ISRAEL STORY FALSE : TELLS
OF DEALINGS WITH SPONSOR
OF SCANDAL

### By Katherine Anderson

The scandalous tale related to police by Mark Israel, pawnshop dealer, about a 'jealous woman' in the life of W. Frank Akin, slain port investigator, was branded absolutely false Thursday by the widow of the murdered man.

'It is silly, in the first place', she said, 'to suppose Frank might have confided in Israel on any private matter. He had no regard for Israel's integrity and frequently said so after being engaged to audit the books of that firm.

'He told me he knew Israel was stealing from his own father-in-law and he said he had no use for that kind of a man. Israel hated him after that, and he hated Israel. Can you imagine the police believing that those two would have confided in each other? That Frank would have confided secrets of his private life to him?

'It is ridiculous on the face of it, and the police are using it for a smoke screen in this whole thing. I suppose they will attempt to find all kinds of things to hurt him.' "

It is the above story that offends the plaintiff, and which he alleges contains the defamatory matter, and

further alleges was published by the defendant in its newspaper "wilfully, maliciously and falsely and without just cause or excuse".

Defendant, in its first affirmative answer, pleaded the foregoing facts and claimed that the article, of which plaintiff complains, was communicated by the widow of said W. Frank Akin, and in defense of his good name as well as her own, and published in good faith and without malice.

For a second affirmative defense, it alleges that the facts in the article published were generally known among plaintiff's friends.

The jury returned its verdict in favor of defendant on November 23, 1934, judgment being entered thereon by the court on the same day. On December 14, 1934, and within the time allowed by the court, plaintiff filed his motion for a new trial which the court, on January 18, 1935, allowed.

One of the grounds of plaintiff's motion for a new trial was that:

"The court erred in instructing the jury that the article as published was qualifiedly privileged, even if it be conceded for the purpose of this assignment of error, that there was sufficient proof of communication of the substance of the article by Mrs. Akin (which of course we do not concede) for the reason that the article far exceeded the occasion and therefore the article was not qualifiedly privileged."

As another ground of the said motion, the refusal of the court to give plaintiff's requested instruction No. 14 is assigned as error. Part of said instruction is as follows: "The language . . . not being within any of the classes of privileged communications, the law implies malice in the author, . . . ."

The court instructed the jury that the communication, as a matter of law, was privileged.

After the court instructed the jury, counsel for plaintiff addressed the court as follows:

"If the court please, I desire to except to the refusal of the court to instruct the jury that in this case there was no privilege, * * *"

■ When the motion for the new trial was presented the above grounds pointed out that the court had instructed the jury that the communication was privileged, and that the said instru tion was erroneous. This was sufficient to put the court on notice of just what counsel claimed as error. It would be idle to say that the plaintiff made no valid exception to the instruction of the court on the question of privilege. If the court had given plaintiff's requested instruction to the effect that the communication was not privileged, he surely would not have instructed the jury to the opposite effect. Error not properly excepted to is where the court is not put on notice of what the party excepting claims to be the law applicable. The motion for a new trial was not granted on the court's own motion, and as the matter was determined on January 18, 1935, it was settled within the time prescribed by chapter 233, Laws of 1933.

There is no dispute regarding the publication of the alleged defamatory matter. The defendant contends that it was published on the suggestion of the widow of the said W. Frank Akin in self-defense, in good faith, without malice, and therefore privileged.

■ When the facts are undisputed, the question of privilege is one for the court, and the matters of good faith and lack of malice are ones for the jury: *Ivie v. Minton,* 75 Or. 483 (147 P. 395); *Peck v. Coos Bay Times,* 122 Or. 408 (259 P. 307); *Kilgore v. Koen,* 133 Or. 1 (288 P. 192).

█ The law seems to be well settled that when one is attacked by defamatory matter published in the press one may resort to the same methods to reply to or rebut the charges made.

"Every man has a right to defend his character against false aspersion. It is one of the duties which he owes to himself and to his family. Therefore, communications made in fair self-defense are privileged. If the person is attacked in a newspaper, he may write to the paper to rebut the charges, and may at the same time retort upon his assailant, where such retort is a necessary part of his defense or fairly arises out of the charges he has made. A man who commences a newspaper war cannot subsequently come to the court as plaintiff to complain that he has had the worst of the fray. But in rebutting an accusation the party should not state what he knows at the time to be untrue, or intrude unnecessarily into the private life or character of his assailant. The privilege extends only to such retorts as are fairly an answer to the attacks." Newell Libel and Slander, 4th Edition, § 429, p. 456.

To the same effect see Odgers on Libel and Slander, 6th Edition, p. 240; 17 R. C. L. § 113, p. 364. The text seems to be well supported by the authorities and by common sense and reason. See Recent Developments in Newspaper Libel, 13 Minn. L. Rev. 21. The law does not look with disapproval on an act which a high-class, good citizen would perform. Mrs. Akin was, and still is, a teacher in the public schools of Portland, Oregon. One of the essential elemental qualifications for that position is a good moral character. She was charged with conniving at and consenting to the alleged adulterous conduct of her late husband. She owed a duty to herself as well as to the community to refute that charge so far as she could, in the same manner in which it was made. If her refutation was pertinent and grew out of or was reasonably connected with the defamatory matter pub-

lished by respondent, and was published in good faith and without malice, she would not be liable. It is no light matter to a school teacher to be accused of a low moral character.

■■ The respondent claimed a confidential, friendly and intimate relationship with the deceased husband. It is this relationship that naturally would give force and effect to those statements. It is common knowledge that people do not confide their short-comings except to their very closest friends and only to friends in whom they have the utmost confidence. Mrs. Akin had a right to show that no such confidential or friendly relationship existed between plaintiff and her late husband. She also had right to show why such relationship did not exist; that, instead of friendship and confidence, the very opposite existed between these two men. It would avail Mrs. Akin but little to simply deny the alleged defamatory matter in the article published by respondent, but if she could show an unworthy motive for the publication of such an article it would then destroy the effect of the article itself. And this would be true whether the whole article was communicated by Mrs. Akin or part of it by Mrs. Goul, the sister of Akin. The sister would have a right to defend the good name of her dead brother: *White v. Nicholls et al.,* 44 U. S. 266 (11 L. Ed. 591); Cooley on Torts, 4th Edition, § 158. The communication being qualifiedly privileged on the part of Mrs. Akin and Mrs. Goul, it would also be privileged on the part of the defendant: *Preston v. Hobbs,* 146 N. Y. S. 419.

■ On the trial of the case, the court instructed the jury as follows:

"It is not denied by plaintiff that he give this interview to the Oregonian, and thereby caused to be published the statements regarding the late W. Frank Akin, which you have heard read. These statements

contain charges of adultery in violation of the so-called Mann Act against the late W. Frank Akin. Both of these charges involve the charge of the commission of felonies. Every man has the right to defend his character against false aspersions, and where charges are made in a newspaper he may resort to a newspaper for a publication of the answer, and may at the same time retort upon his assailant, where such a retort is a necessary part of his defense, or fairly arises out of the charges that he is answering. And this principle would apply to the widow of the man who is deceased.''

This instruction was a correct exposition of the law as applicable to the facts in the instant case.

Respondent calls our attention to § 1-808, Oregon Code 1930, which enumerates the necessary allegations in a complaint for libel or slander. He also calls our attention to § 1-809, Oregon Code 1930, which reads as follows:

''In the actions mentioned in the last section, the defendant may, in his answer, allege both the truth of the matter charged as defamatory, and any mitigating circumstances, to reduce the amount of damages; and whether he prove the justification or not, he may give in evidence the mitigating circumstances.''

Respondent contends that the above-quoted section of the Code limits the defense to the truth of the charges and mitigating circumstances. This contention is untenable. At common law that the publication was privileged, has always been a defense to actions for libel. The above section was intended to enlarge and not to limit the defenses to such actions.

The circuit court erred in setting aside the verdict and judgment and granting a new trial, and his order in that respect will be set aside and the case remanded with instructions to enter judgment on the verdict in favor of defendant. It is so ordered.

BELT, KELLY and ROSSMAN, JJ., concur.