EDMUND A. HAAS, appellee, v. EVENING DEMOCRAT COMPANY, appellant.

No. 50213.

(Reported in 107 N.W.2d 444)

518

FEBRUARY 8, 1961.

J. Francis Phelan and Johnson & Phelan, all of Fort Madison, and Harold F. Martin, of Keokuk, for appellant.

R. P. McManus and N. E. McManus, both of Keokuk, for appellee.

THOMPSON, J.—On February 13, 1957, plaintiff filed his petition in twenty counts, claiming damages in each against the defendant for alleged libels. The matter was submitted to a jury, which returned verdicts against the defendant in the sum of $3000 each on Counts V, X, XIII, XVI and XVII; and in the amounts of $25,000 on Count XI and $35,000 on Count XVIII. Defendant's motion for judgment notwithstanding verdict was denied as to all counts. Its motion for new trial was denied as to Count XI on condition that plaintiff file a remittitur of $19,000 of the total amount, and was likewise denied as to Count XVIII on condition that a remittitur of $29,000 be filed. The remittitur as to Count XI was duly filed, and the motion for new trial thereupon denied; but the court considered the alleged remittitur filed as to Count XVIII to be conditional and not in accord with its ruling, and granted a new trial. From judgment entered on the verdicts the defendant has appealed. The plaintiff has cross-appealed from the ruling granting a new trial on Count XVIII. The remaining thirteen counts were eliminated either by direction of the court or by jury verdict and are not involved here.

The litigation before us grows out of a public controversy concerning the construction of a boat dock and harbor on the Mississippi River front in the city of Fort Madison. The matter was debated over a period of several years, beginning in 1951. Involved in the dispute were the Dock Commission of the city, the city council and its members, the plaintiff and the defendant. The defendant, publisher of a daily newspaper in Fort Madison, took a position favoring the new dock; the plaintiff

strongly and vociferously opposed it. He did this by written and verbal protests to the council, to the U. S. Army Engineers, by the circulation of petitions, by paid advertisements in defendant-newspaper, and by circulation of handbills. Much of this literature was signed "The Committee for Better Government, Ed Haas, Secretary"; but there is no doubt from the record that the plaintiff was the active organizer and chief proponent of the opposition to the contemplated dock. The matter raged as a public controversy in Fort Madison for several years. During this time the defendant published certain news stories and editorials which the plaintiff now claims were libelous. These form the basis for the charges contained in Counts V, X, XIII, XVI, XVII and XVIII. Count XI is based upon the publication by the defendant of a letter from a member, or former member, of the city council who had been taken severely to task by the plaintiff and who retaliated somewhat in kind.

The errors assigned are that the trial court erred in refusing to sustain defendant's motion for judgment notwithstanding verdict on each of the seven counts on which the jury found for the plaintiff; and in refusing to grant a new trial on Counts V, X, XI, XIII, XVI and XVII. The major contention is that the evidence adduced in the case does not support the verdicts rendered. The plaintiff has moved to dismiss the appeal on the ground that the errors relied upon are not sufficiently specific, but are omnibus in character. While they might have been more definitely stated, we think they sufficiently apprise the court of the basis of defendant's complaints. The motion to dismiss is denied.

I. No specific complaint is made of the instructions or rulings on evidence, but we think the error into which the court fell, and which must have pervaded its thinking throughout the case, is shown by its Instruction No. 10-A. There the jury was told that the publications complained of by the plaintiff were "each libelous per se, and the law presumes malice." Instruction No. 12 said that newspapers are liable for libelous publications "without proof of express malice or actual ill-will against the person libeled." From this viewpoint, the court would have been correct in denying defendant's motions for directed verdict and

for judgment notwithstanding; but it was not correct. In the first instance, a publication must be actually defamatory. In Fey v. King, 194 Iowa 835, 840, 190 N.W. 519, 521, we quoted with approval from 25 Cyc. 253, 254, 255:

"'Defamatory words, to be libelous per se, must be of such a nature that the court can presume as matter of law that they will tend to disgrace and degrade the party or hold him up to public hatred, contempt, or ridicule or cause him to be shunned or avoided. * * * In many cases, moreover, words charging plaintiff with the commission of acts permissible in law, although they may lack public approval, have been held not to expose plaintiff to hatred, contempt, ridicule, or disgrace in the sense or to the degree required by the law of libel; as, for instance, charging one with setting up the statute of limitations, or the illegality of a contract, as a defense. To accuse one of being deficient in some quality which the law does not require him * * * to possess is not libelous per se.'" In Shaw Cleaners & Dyers v. Des Moines Dress Club, 215 Iowa 1130, 1137, 245 N.W. 231, 234, 86 A. L. R. 839, we cited Fey v. King, supra, as controlling on the point, and said: "* * * in order to constitute defamation, the alleged libelous matter must assail 'the integrity and moral character of the injured party.'"

The court properly instructed the jury, in effect, that the plaintiff, by interjecting himself into a matter of public concern and by criticizing the actions of public officials and requesting certain action from them had invited or at least excused comment and criticism from those who held other views. This was correct. Restatement, Torts, Volume III, sections 606, 610; Newell, Libel and Slander, Fourth Ed., 543, section 496(4). We ourselves have held, in Klos v. Zahorik, that a clergyman is such a "public man" as that his discharge of the public functions of his calling is a proper subject of comment. 113 Iowa 161, 165, 84 N.W. 1046, 1047, 53 L. R. A. 235; and in Cherry v. Des Moines Leader, 114 Iowa 298, 304, 86. N.W. 323, 325, 54 L. R. A. 855, 89 Am. St. Rep. 365, that one who takes part in a public performance or exhibition thereby becomes the subject of comment and criticism. The plaintiff was so evidently engaged here in a public controversy that no question should

arise but that comment and criticism were permitted; in fact invited. He communicated with the city council, both in writing and verbally; he circulated handbills; and he inserted many paid advertisements in the columns of defendant-paper. All of these were attempts to influence the council and the public adversely to the construction of the proposed boat dock.

So the publications of which he now complains were without doubt qualifiedly privileged. Under these circumstances, the burden was upon the plaintiff to plead and prove actual malice. Robinson v. Home Fire & Marine Insurance Co., 244 Iowa 1084, 1093, 59 N.W.2d 776, 782. Yet we find the court instructing the jury, in its No. 12, that the defendant would be liable without such proof. We are aware error is not predicated upon the instructions, but we think comment upon them is warranted because they show the confusion in the court's thinking and go far to demonstrate the error in its rulings on defendant's motions.

The plaintiff relies to some extent upon the definition of libel found in section 737.1 of the present Code. This was discussed in Fey v. King, supra, and it was held that the section refers to criminal libels, and that to constitute a libel actionable in a civil suit there must be a "malicious defamation" of the person alleging injury.

II. With the foregoing principles in mind, we turn to a consideration of the specific charges in the seven counts upon which verdicts were returned in favor of the plaintiff. Plaintiff's petition makes the same allegations in each count, except for Paragraph 3 of each, in which the specific libel claimed upon is set out. The petition alleges that plaintiff had been for 33 years engaged in the automobile business in Fort Madison and enjoyed an established credit reputation for honesty and integrity and a profitable business; that defendant published the statements for the malicious purpose of injuring plaintiff in his reputation and business as aforesaid, and said statements were false and "intended to provoke plaintiff to wrath and expose him to public hatred, contempt and ridicule." Further allegations are that the publications were for the malicious and wicked purpose of causing the public to believe plaintiff was

against progress for the city, was morally and socially corrupt, antisocial, a loathsome and disgusting person and unworthy of the confidence and respect of the public, and were further maliciously intended to injure plaintiff in his business as an automobile dealer. It is alleged "plaintiff has been injured in his reputation, credit and automobile business. He has suffered great embarrassment and humiliation, his mental and physical health has been seriously impaired." By way of answer, defendant denied malice; denied the statements were intended to injure plaintiff in any way, but were fair comments upon a public controversy in which plaintiff was engaged; and denied the comments were libelous per se or per quod.

The alleged libelous matter set forth in Count V was this: "Edmund A. Haas has been the leader in the drive to keep the Caldwell firm out of Fort Madison. Haas is the owner of a private harbor at the foot of Twentieth Street. He persuaded the city council to make an objection to the dock's project but Mayor Leroy Bean vetoed the resolution."

Little comment is required to demonstrate the want of actionable libel in the foregoing. Although Haas had several times, both in writing and orally, claimed to be one of the owners of the private harbor at Twentieth Street, he denied ownership on the trial and claimed he had so told the editors of the Democrat. We said in Robinson v. Home Fire & Marine Insurance Co., supra, pages 1093, 1094 of 244 Iowa, page 782 of 59 N.W.2d: "Plaintiff has the burden to prove actual malice in the making of a defamatory statement that is qualifiedly privileged. The presumption is it was made in good faith without malice. Falsity of the statement is insufficient to raise the inference of malice." Many cases are cited.

There is no real basis in the record for a finding of malice. And another rule comes into play here. It is that no action may be predicated upon a publication which charges the plaintiff with doing no more than he had a legal right to do. We quoted above from Fey v. King the approved statement that it is not libelous per se to charge one with being deficient in some quality which the law does not require him to possess. In Hollenbeck v. Hall, 103 Iowa 214, 215, 72 N.W. 518, 519,

39 L. R. A. 734, 64 Am. St. Rep. 175, the defendant had published a letter which accused the plaintiff of " 'having no other defense, he cowardly slinks behind that of statutory limitation' " in defending against an account. The letter further said: " 'Such a course is not exactly in accordance with our idea of strict integrity.' " But we said that, since the plaintiff had a legal right to avail himself of the defense, there was no actionable libel.

In the count we are considering, the charge against the plaintiff was only that he owned a private boat harbor; that he was the leader in a drive to keep out a firm which wished to improve the river front in another place; and had persuaded the council to make objection. He had a right to lead a drive to prevent the construction of the new docking area even though he did own a boat harbor of his own. The motion to direct and the motion for judgment notwithstanding should each have been sustained.

III. The next in numerical order upon which plaintiff had verdict and judgment is Count X. This concerned an editorial published by the defendant which discussed the issues in a coming municipal election, particularly concerning the proposed new dock construction and the Caldwell Company which was to be given some space for a private plant in return for aid in building the dock and harbor. The claimed libel was this: "* * * It is impossible to have much respect for the organized opposition to the Caldwell Company. The Democrat must agree with Mayor Leroy Bean who said last January that the opposition came from one man who because he owned a private harbor was determined that the city dock commission should be stopped from performing its legal function of developing the river front. The mayor also observed that the beauty of Riverview Park appeared to be a 'smokescreen' issue and pointed out that Caldwell's agreement to landscape one half of Riverview provided the quickest and best way to beautify the park. * * *."

Again, the plaintiff was not accused of doing anything he did not have a legal right to do. The effect of the libel is that the reason why it was impossible to "have much respect" for the organized opposition to the Caldwell Company was that it

came from one man, who was motivated by the fact that he owned a private harbor. But the plaintiff had a legal right to oppose the new construction and the granting of rights to the Caldwell Company, even though he might be the owner of a possibly competing dock and his motives were to that extent selfish. As we said in Hollenbeck v. Hall, supra, page 217 of 103 Iowa, page 519 of 72 N.W.: "It cannot be libelous to accuse one of doing what the law approves." The motions attacking this count should also have been granted.

IV. We depart from the numerical order of the counts upon which verdict and judgment were rendered, to conclude with those which we think are ruled by the same principles of law set forth in the two preceding divisions. In Count XIII the pleaded libelous matter was this:

"That on the 26th day of May, 1956, defendant, by its duly authorized agents, falsely and maliciously published of and concerning plaintiff an editorial which contained, among other things, the following:

"* * * But, many of them have been thoroughly confused by the words of a man who wants no improvements.

"Edmund A. Haas owns a large harbor at the foot of Twentieth Street. Although this harbor has been in existence for several years and there are no harbors of equal quality in the area, Mr. Haas has been unsuccessful in persuading either pleasure boat owners or businesses to use his facilities.

"Perhaps, the reason for his failure is that he has spent far more time, energy, and money knocking other harbor projects instead of building up the business of his own harbor. His utterances have probably deterred some boat owners and firms from doing business with him.

"Mr. Haas has succeeded in preventing development of the uptown river front during the past few years. But, it hasn't brought him any business in his own harbor.

"It may be too late for Mr. Haas to get any business for his harbor. But, if he will give boat long-term leases for boathouses and if he will agree to purchase any permanent improvements when he decides not to renew a lease, he may still be able to secure a rental income from his harbor.

"But, regardless of the business problems of Mr. Haas, the people of Fort Madison have every right to develop the public lands along the river for both recreational and business purposes. They should not be subjected to persecution just because they exercise their American right of free choice and do not deal with Mr. Haas.

"* * * No matter how much Mr. Haas may object, it is the clear duty of the city council to put the best interests of all of Fort Madison above the purely private interests of Mr. Haas. Although the councilmen will probably receive the same type of abuse that was showered on their predecessors, we hope they are men enough to do their duty."

Here the plaintiff is called a "man who wants no improvements", and it is said he has prevented the development of the river front. Considerable space is devoted to analysis of Mr. Haas' own business problems in connection with the river frontage which he was said to own, and a good deal of gratuitous advice given him. The city council is urged to put the public interest before Mr. Haas' purely private interest. But on analysis we find nothing which tends to defame the plaintiff, or to hold him up to public disgrace, contempt or ridicule. He is accused of being against progress, wanting no improvements, and having prevented them. The law does not prohibit such an attitude. In fact, there is today in the United States a substantial school of thought, with many followers, which holds there is too much spending of the public funds and too much so-called "improving" of the public domain generally. Mr. Haas may be placed in this category by the editorial quoted. If so, he has a good deal of company; and he is not accused of doing anything he is not permitted by law to do. He had a right to be conservative, and to operate his own business as he saw fit, even though he did not do it successfully. Again the motions should have been granted.

V. Count XVI was based upon this allegation contained in a news article which the defendant published:

"* * * Jaycee members also took a dim view of the methods and motives of Edmund A. Haas in his fight against river-front improvement. Haas, local auto dealer, has his own relatively

large boat harbor at the foot of Twentieth Street. Haas' 'Committee' primarily has been opposed to any and all river-front improvement.

"Membership of the 'committee', with exception of Haas and Frank L. Horn, a 'director', has never been publicly disclosed. * * *." The statement that the Jaycee members "took a dim view of the methods and motives of Edmund A. Haas in his fight against river-front improvement" seems to mean no more than that they disagreed with and did not like the campaign he was carrying on. They were for the improvement; Haas was against it. It is repeated that he had his own private boat harbor, and that he was against any and all river-front improvement. We have pointed out he had a right to be so opposed, and it was not libelous to say he was doing what he had a right to do. So with the statement that membership in the "Committee", by which we understand was meant the "Good Government Committee", had not been disclosed. No law required that it be. It is true the plaintiff says here, as in each count, that the words used were "false, malicious and libelous".

██ An innuendo, in the law of slander and libel, is only a word of explanation, an attempt to give a meaning to what was actually expressed. We said in Wallace v. The Homestead Co., 117 Iowa 348, 363, 364, 90 N.W. 835, 840: "An innuendo is not an averment, but only matter of explanation. * * * An innuendo cannot extend the sense of the expressions in the alleged libel beyond their own meaning." The question is discussed at some length in Shaw Cleaners & Dyers v. Des Moines Dress Club, supra, page 1135 of 215 Iowa, with quotations from Salinger v. Des Moines Capital, 206 Iowa 592, 596, 217 N.W. 555, 557; Wallace v. The Homestead Co., supra, and 36 C. J., Libel and Slander, 1161, which we set out: " 'Words which are defamatory per se do not need an innuendo, and, conversely, words which do need an innuendo are not defamatory per se.' " The allegation by way of innuendo that the words were "false, malicious and libelous" adds nothing to a statement which shows no actionable defamation on its face. The motions should have been granted against this count.

VI. Count XVII alleged this statement, apparently in a

news article: "* * * Edmund A. Haas, local auto dealer, who owns his own relatively large boat harbor at the foot of Twentieth Street. Haas has long been the chief foe to any and all river-front improvements here." The relevancy of the discussion and the holdings in the preceding divisions of this opinion is so clear no further space will be given to it. The motions to direct and for judgment notwithstanding were meritorious as against this count, and should have been granted.

VII. We return to Count XI, which involves a somewhat different question and requires a further statement of facts. The claimed defamatory matter was found in a letter to the editor, published by the defendant on November 17, 1955. It was signed by one Mary Esther Mosley, who had been a member of the city council during a part at least of the controversy over the proposed new construction. It takes the plaintiff somewhat severely to task. We quote:

"* * * But let us not forget the workings of a man who could slander honest honorable citizens.

"This man shouted 'Dictator' so loudly at others that it was overlooked that he was employing dictator methods. Is it not the method of the dictator to grasp an untruth and shout it so long and so loud that the people become convinced that he might be right? And what happens to the person who is using dictator methods when he runs up against the law? . . . he just shouts longer and louder of 'the rights of the people' and ignores the law.

"What sort of a mind does it require to twist the truth, to have no respect for the position, the reputation, the honesty, the integrity of his fellow citizen? Is this man himself so intelligent, so clear-thinking, so straight forward, so capable? If so, why then has he not offered to serve his city . . . instead of condemning those who are doing their level best?

"* * * I do not believe in the right of any one man to mishandle the truth, to twist it to his own convenience, to rabidly toss accusations at others because of a difference of opinion.

"* * * I deplore such lack of fair-mindedness. I detest the methods this man has used to try to force people to think his way and no other. I think he has been cruel, abusive and

untruthful in his attacks on me. I think he has harmed innocent people . . . which is not to be condoned in this great free country of ours.

"For this confused man, I feel deep sympathy . . . for his methods I feel only contempt * * *."

We shall not attempt to determine whether, other considerations being absent, the letter was in fact defamatory. There are other considerations which call for a holding that the publication of the letter was not actionable.

Beginning in 1951 the plaintiff interjected himself into the controversy over the construction of the proposed new dock and harbor. Commencing in 1953 and intermittently thereafter he published many newspaper advertisements in defendant's paper attacking the new project, and in some of them he took some of the council members severely to task. There were also some handbills circulated. All told, there were more than thirty of these publications. The limitations of space will not permit quotation here of the many attacks made by the plaintiff upon members of the city council or the proposed dock construction project. It will suffice to say that he was active and aggressive; and it is fair to comment that he took the lead in belligerency in his strictures on those who opposed him. If the whole controversy developed into a free-swinging affair in which there was considerable give and take, the plaintiff must bear his full share of responsibility. He was at no time a shrinking violet; he gave at least as much as he took.

In addition to his protests and objections to the new dock and harbor, he took an active part in a municipal election in November of 1955, with the avowed purpose of defeating those members of the city council who had not seen eye to eye with him and who were candidates for re-election. Specifically, he on occasion named Mary Esther Mosley, the writer of the published letter above set forth, in paid political advertisements and other publications. In a paid advertisement inserted in the Democrat just before the election, signed by Ed Haas, Secretary, Committee for Better Government, is this:

"On December 8, 1954, the Mayor, Kiehne and Mosley perpetrated in our opinion one of the biggest give-aways ever

to take place in our city. They agreed to the notorious Caldwell lease, bartering away public property which they had no right to do. No public hearing was had. It was not even brought before the Council for their approval. Later Johnston joined the give-away group.

"Not only were the people sold out to the Caldwells, but the city is bound by the lease to build and maintain roadways to and across the Caldwell property without stating the portion of the costs the Caldwells should pay.

"* * * By the actions of Bean, Kiehne, Mosley and Johnston in defending the Dock Commission in the Caldwell give-away deal there was only one course left, the Courts, and a local citizen who would not submit to this trampling of her rights has been forced to take legal action to defend her rights." There were some references to: "Little Dictators."

On November 3, 1955, again just before the election, the plaintiff published and circulated this statement as a part of a long attack on the methods of those who opposed him in the campaign: "Keep in mind when you go to vote, keep in mind what Bean, Kiehne, Mosley and Johnston have done and what they stand for, and if you do I do not believe your conscience will let you vote for them, you will vote against them and thank God that we have some good honest men who are opposing them."

The plaintiff should not have been surprised if those whom he castigated did not meekly turn the other cheek, but attempted to retaliate. A similar situation was ruled upon by the Oregon Supreme Court in Israel v. Portland News Publishing Co., 152 Ore. 225, 232, 53 P.2d 529, 532, 103 A. L. R. 470. The court quoted and followed the rule laid down in Newell, Libel and Slander, (Fourth Ed.) 456, section 429: " 'If a person is attacked in a newspaper, he may write to the paper to rebut the charges, and may at the same time retort upon his assailant, where such retort is a necessary part of his defense or fairly arises out of the charges he has made. A man who commences a newspaper war cannot subsequently come to the court as plaintiff to complain that he has had the worst of the fray.' "

The Oregon court also cited Odgers on Libel and Slander,

(Sixth Ed.), page 240, and other authorities. We agree with the rule, and find it particularly applicable here. The Mosley letter was no more than a fair reply to the attacks on her and on the city council of which she had been a member. She had been accused of giving away public property and of agreeing to a "notorious" lease. The statement that the voters should "thank God that we have some good honest men who are opposing them" seems fairly to imply that Bean, Kiehne, Mosley and Johnston were not honest. It is difficult to think that plaintiff expected his assaults on these people to be borne in silence. They had the right to make a fair reply; Mrs. Mosley did so, and we think she did not go beyond the bounds of fair defense and retort.

The motions should have been granted as to Count XI.

VIII. Count XVIII presents a somewhat different situation. The actionable libel alleged there was that the defendant published an editorial which said:

"* * * A boat harbor will make Fort Madison a better community. How can any citizen who places public interest above private interests and partisan politics deny this simple fact? There is no honorable reason for opposing a local boat harbor.

"* * * Those who throw up this 'red herring' issue are merely trying to delay construction of the boat harbor. They know that these suits are not related to the proposed new law or the right of the city to build a small boat harbor. * * *."

The defendant says that the plaintiff was not named in the editorial and so cannot complain. But plaintiff's petition charges that all the claimed libels were directed at him, and "the intendments of defendant, as enumerated herein, were understood by the public generally as so intending and charging." It is not necessary that the publication complained of name the plaintiff; it is sufficient if petition charge be made that it was meant to apply to him and upon sufficient showing in the whole record that the jury find it was intended to refer to him. Shaw Cleaners & Dyers v. Des Moines Dress Club, supra, 215 Iowa 1130, 1136, 245 N.W. 231, 234; Overstreet v. New Nonpareil Co., 184 Iowa 485, 494, 167 N.W. 669, 672;

Codner v. Central Credit Rating Agency, 180 Iowa 188, 190, 191, 161 N.W. 657, 658; section 659.1, Code of 1958.

The defendant in the editorial in which the excerpt quoted above is found said: "There is no honorable reason for opposing a local boat harbor." The language used could, under the record, fairly be found by the jury to be intended to apply to the plaintiff. He was, as we have pointed out, the head and front of the opposition; at least, he was the one who had appeared publicly and frequently. The antonym of "honorably" is "dishonorably, shamefully, unjustly." Webster's New International Dictionary. So it could have been found that the plaintiff was accused of dishonor, shamefulness or injustice in opposing the boat harbor. Here we think the defendant could be found to have exceeded its privilege. It is said in 53 C. J. S., Libel and Slander, section 97(a), page 153: "The protection of a qualified privilege may be lost by the manner of its exercise, * * *. * * * The privilege does not protect any unnecessary defamation."

See also Robinson v. Home Fire & Marine Insurance Co., 244 Iowa 1084, 1094, 59 N.W.2d 776, 782; Robinson v. Home Fire & Marine Insurance Co., 242 Iowa 1120, 1131, 49 N.W.2d 521, 528. We agree with the rule so laid down, and its application here. Without the protection of the privilege, the words used were defamatory and malice might be found. The court properly denied the motions to direct and in arrest as to this count.

IX. The trial court granted a new trial as to Count XVIII last above considered. The plaintiff has cross-appealed from this ruling. It appears that the court, considering the amount awarded by the jury verdict on this count, $35,000, to be excessive, ordered a remittitur of all of said amount in excess of $6000. The plaintiff filed a remittitur of the sum of $29,000, but attached this condition: "said remittitur, however, is made upon the express condition that defendant pay the amount of the judgment heretofore entered upon said Count XVIII as reduced by this remittitur, upon demand." The court held the remittitur insufficient, and granted a new trial.

The plaintiff in his cross-appeal assigns three errors: 1, the trial court erred in excluding evidence concerning plaintiff's

loss of business; 2, it erred in finding the verdict of the jury was excessive so as to require a remittitur on pain of grant of a new trial; 3, the plaintiff's remittitur was sufficient.

We think under the pleadings in this case the trial court properly excluded evidence of damage to plaintiff's business; and further, that it was within its fair discretion in holding the amount of the verdict excessive. On the third assignment, which is somewhat contradictory of the first two in that it contends the plaintiff did in fact comply with the order for remittitur which the first two assignments say should not have been made, he urges the remittitur was in accordance with the order. He cites Ford Hospital v. Fidelity & Casualty Co., 106 Neb. 311, 183 N.W. 656. But there the order was that the judgment might be satisfied by the payment of $2000 less than the verdict. The judgment was not paid and the remittitur was not filed. Payment of the judgment was held to be a condition of the order for remittitur. That is not the situation here. It is evident the condition attached to the remittitur would have deprived the defendant of its right of appeal. No such intention appears in the order for remittitur. The trial court ruled correctly in holding the remittitur insufficient and in granting a new trial.

X. The plaintiff urges throughout his argument that there is a distinction between a qualified privilege and the right of comment. We have considered the questions raised by the appeal as though the defendant's rights were measured by the question of qualified privilege. The plaintiff so far interjected himself into public controversies over the building of the proposed boat dock and the election of members of the city council that he became a public figure. He took an aggressive and extremely controversial attitude. He made numerous publications in which he was by no means backward in imputing improper motives to the members of the dock commission and, more particularly, to the mayor and those members of the council who disagreed with him. The controversy was to a great extent initiated by him. Colloquially, "he was in there pitching" at all times; and there is little doubt that he threw the first curve. Human nature being what it is, he might have well expected some retorts in kind.

In any event, whether the defendant's right was that of qualified privilege or only of fair comment is immaterial under our holdings in the foregoing opinion. The result as to each count would be the same.

XI. Attention should be called to the great amount of immaterial matter contained in the record. We realize the difficulties which face trial courts in settling the records in many cases on appeal. The burden should be chiefly upon the attorneys, particularly in eliminating totally immaterial and irrelevant matter from the final record. It is natural that the trial court, faced with a stipulation of opposing counsel that the pages submitted constitute the complete record, should enter its order approving it. Such a stipulation and the following order appear here. Counsel for the appellant should have the first duty of weeding out the record; and the opposing counsel should carry a part of the burden to see that this is done. The result of a record encumbered by much totally irrelevant matter is that an extra burden is thrown upon this court. It must struggle through all of it to determine what is and what is not germane. Printing costs are also much higher than they need be. We suggest due care, first by the attorneys and second by the trial courts, in following the rules on this matter. The plaintiff has filed a motion to tax the costs occasioned by these unnecessary and superfluous matters to the defendant. While, as we have indicated, the first responsibility for a proper record rests upon the appellant, in this case the defendant, we think the appellee cannot later complain if he stipulates that the submitted record is correct. The motion to tax costs is denied.

The case is reversed as to judgments on Counts V, X, XI, XIII, XVI and XVII with directions to grant defendant's motion for judgment notwithstanding on each. It is affirmed as to both appeals on Count XVIII. Costs in this court will be taxed four fifths against plaintiff and one fifth against defendant.—Affirmed in part and reversed in part on defendant's appeal; and affirmed on plaintiff's appeal.

All Justices concur except Bliss, J., who takes no part.