# Richmond

RUTH G. CROWSON v. JAMES A. SWAN, JR.

March 14, 1935.

Present, Campbell, C. J., and Holt, Epes, Gregory, Browning and Chinn, JJ.

The opinion states the case.

*Burnett Miller* and *R. E. Scott,* for the plaintiff in error.

*John S. Barbour* and *C. M. Waite,* for the defendant in error.

CAMPBELL, C. J., delivered the opinion of the court.

Mrs. Ruth G. Crowson, plaintiff in the lower court, filed her notice of motion against the defendant, James A. Swan, Jr., to recover damages for an alleged assault and battery committed by defendant upon her with intent to commit rape.

Upon the plea of not guilty, the action was defended upon the grounds that no assault was committed upon plaintiff either with or without the intent charged; that at the time of the alleged assault defendant was incapable, mentally and

physically, of making the assault charged with the intent charged; that even if the assault had been committed, defendant has been punished therefor in the manner required by law.

There was a trial before a special jury, and upon a conflict of evidence there was a verdict in favor of the plaintiff in the sum of five dollars. The plaintiff moved the court to set aside the verdict on the ground of gross inadequacy of damages, for error committed by the court in admitting and rejecting evidence and in giving and refusing instructions.

The court denied the motion of plaintiff and entered judgment in her favor for the sum of five dollars, which, under the provisions of section 3523 of the Code, carried the costs against her in the sum of $329.15.

The case of the plaintiff as displayed by the record is as follows: The plaintiff, a married woman and the mother of four children, was a resident of Chester, South Carolina. In August, 1932, she came to Culpeper county to visit her sister, Mrs. Guy May, who resided at Inlet, Virginia, and while there the alleged assault and battery occurred.

In the yard adjacent to the May residence and in close proximity thereto was a small building known as a pump house. There were three rooms in this building, to-wit: A laundry room, an engine room and a shower bath. The partition wall between the bath room and the engine room was not solid, and there was an open space of approximately fifteen inches at the bottom of the partition. At the upper right-hand corner of the partition wall there was an opening in the plaster which afforded a view of the bathroom to one standing on the pump in the engine room. There was also a window into the bathroom and this window was covered by a curtain.

On the afternoon of the alleged assault and battery, while several children were playing in the yard at the home, the plaintiff and her sister, Mrs. May, repaired to the bathroom to take a shower bath. While they were in the act of bathing, the defendant, in an intoxicated condition, arrived in

an automobile driven by his employee, a man named McGee. He enquired for Mr. May and when informed that he was not at home, defendant enquired of the children if Mrs. May was at home. Informed that she was, he said, "Mrs. May is the one I want to see anyway." He then got out of his car, came to the pump house door, which was unlocked, and started in the pump house. One of the children said to defendant, "You cannot go in there. Mrs. May is taking a bath." He said, "That don't matter," pushed open the door and entered. When he arrived on the inside he stooped down and looked through the opening into the bathroom. He then climbed on the engine and looked through the opening at the top. When Mrs. May remonstrated with him he broke open the locked door to the bathroom, violently caught the plaintiff by the arm and attempted to "jerk" her through the doorway. Mrs. May put on her bathrobe and ran out of the back door to the house. When she returned to the pump house a few minutes afterwards she met the defendant coming out the front door and found the plaintiff in an unconscious condition on the floor of the pump house.

The case of the plaintiff was challenged by the defendant upon every material point. In addition to the introduction of evidence that the defendant, at the time of the alleged assault and battery, was in a maudlin state of intoxication, the defendant introduced two witnesses whose account of the occurrence at the May home is in direct conflict with the account of plaintiff and Mrs. May. H. H. McGee stated in substance that defendant, on the day of the alleged occurrence, was so drunk that he required assistance to enable him to walk. In response to the question, "Tell the jury what happened," the witness replied as follows: "He wanted to give Mr. Bickers a drink and told me to go over to the grocery store and get a ginger ale and some ice. I went over there to get the ginger ale. When I came back with the ice and ginger ale Mr. Swan had gone through the back garage and come through the Knee-High place I suppose; I could not find him, and he called me from the front and I went to the front and he had gotten in the car.

He says, 'Take me to the farm, I am getting too drunk to stay here;' I got in the car with him. We drove on down just about the filling station at Inlet. I said, 'It is too late to go to the farm now. I have to go away tonight at seven o'clock; you stay too long down there.' That was between the filling station and the forks of the road, and he says, 'Well, drive in here to Spicer's barn and see if we can get a drink.' I drove down to Spicer's barn and stopped the car, and he says, 'Get out and find Spicer.' I got out, went to the barn door, looked all through and did not find anybody. I came back. I said, 'He has finished milking I guess and gone.' I got back in the car and drove off and got to Guy's house; he said, 'Stop here a minute, I want to see Guy.' Two or three children were playing in the yard; I do not know whether it was two or three. I know it was two. He asked where Guy was; they first told him down in the garden. He asked them over again. One of them said he was in the orchard and he asked the third time; said down in the field somewhere. We could hear the water running in the pump house. He says, 'I tell you Guy is in here.' Went to the door, knocked two or three times before anybody answered. Presently a woman answered, says, 'I will be out in a minute; I am taking a bath.' Mr. Swan turned around facing the car, and it was not over a minute before Mrs. May was out at the other door. Whether she came around the house or through that part, I do not know. I had my eyes set on him. She came out and appeared to be fully dressed, that is house dress. She said, 'It is Jim Swan. I am surprised at you, down here drunk as a lord.' Says, 'I will get Guy for you.' She started in the house. He walked on, got in the car and we drove on back to town."

On cross-examination the witness admitted that defendant went to the window of the bathroom and "probably tried to look in the window."

Sarah Bennett testified in chief as follows:

"Q. Sarah, what is your name?

"A. Sarah Bennett.

"Q. How old are you?

"A. Eleven.

"Q. Eleven years old?

"A. Yes, sir.

"Q. Where do you go to school?

"A. Culpeper.

"Q. You were summoned here as a witness for the plaintiff, were you not?

\* \* \* \* \* \* \* \*

"Mr. Miller: We will admit the fact.

"Q. Sarah, were you at the May residence, Saturday evening, in August, when Mr. Swan and another man drove up there in the car and got out?

"A. Yes, sir.

"Q. Who was there at the time with you?

"A. A little *out* in the yard with me, a little boy.

"Q. Was little Ruth Crowson there with you at the time?

"A. No, sir.

"Q. Nobody in the yard but you and the little boy?

"A. That is all.

"Q. Who was the little boy?

"A. Mrs. Crowson's son.

"Q. About how old is he?

"A. Six years old.

"Q. Just tell the jury what was done, what happened there when the car came in?

"A. Well, Mr. Swan asked for Mr. May. Asked where Mr. May was.

"Q. Before that occurred where did the car go?

"A. At the barn.

"Q. Did anybody get out of the car?

"A. I did not see anybody.

"Q. Then the car came back down near the house, did it?

"A. Yes, sir.

"Q. Then what was said by anybody?

"A. Mr. Swan asked where Mr. May was, and I think Sonny Crowson asked Mrs. May where he was. Mrs. May said he was not there; then he asked for Mrs. May.

"Q. Did you tell Mr. Swan that?

"A. Yes, sir.

"Q. And then what was asked?

"A. And then he asked where Mrs. May was, and I told him she was in the shower bathroom.

"Q. What did he do then?

"A. He got out of the car.

"Q. Where did he go?

"A. He went to the door.

"Q. Which door?

"A. To the pump house door.

"Q. What did he do then?

"A. He stepped in the door.

"Q. With both feet?

"A. With one.

"Q. And what did he do?

"A. He came right on out.

"Q. Did you hear any statements made there by anybody in the bathroom, or anybody out?

"A. No, sir.

"Q. You said that Ruth was not with you. Where was Ruth at that time?

"A. She was in the shower bathroom with her mother.

"Q. You know what she was doing in there or why she went in there?

"A. She went in there to take a bath.

"Q. You know why Mr. Swan stepped up and backed out of the door?

"A. No, sir.

"Q. Where did you go then, or what did you do?

"A. I was standing there in the yard.

"Q. Did you hear Mrs. May make any statement to Mr. Swan?

"A. No, sir.

"Q. Did she say anything about where Guy was?

"A. She said that he was down in the garden.

"Q. Was that in response or not to a question from Mr. Swan as to where Guy was?

"A. He asked at first.

"Q. After he got to the door, you mean?

"A. No, while he was in the car, when he first got there.

"Q. You did not hear him ask the second time?

"A. No, sir.

"Q. But did you hear Mrs. May say he was in the garden?

"A. Yes, sir.

"Q. Then what did he do?

"A. He sent me down there and I took the little boy.

"Q. Mr. Swan sent you down there in the garden?

"A. Yes, sir.

"Q. Did you go down to the garden with the little boy?

"A. Yes, sir.

"Q. Was Ruth with you then?

"A. No.

"Q. Was not there at all?

"A. No.

"Q. Did you find Guy in the garden?

"A. No, sir.

"Q. How long were you gone down there?

"A. I reckon I was gone down there about five minutes.

"Q. When you got back where was Mr. Swan?

"A. He was standing by the car.

"Q. Did you see anybody else there?

"A. No, sir.

"Q. Did you see Mrs. May?

"A. Yes, she was coming up the steps.

"Q. Did you hear her say anything?

"A. She said she was going in the house to get a gun.

"Q. Did you see Mr. Swan go to the bathroom door?

"A. No, sir.

"Q. Did you see him put his hand on the door?

"A. No, sir.

"Q. Could you have seen him if he had done it?

"A. No, sir, not very well.

"Q. When you saw Mrs. May, how was she dressed?

"A. She had on a dress.

"Q. Did she have on a bathrobe?

"A. No, sir.

"Q. What kind of a dress was it?

"A. A brown dress.

"Q. Did Mr. Swan appear to be drunk?

"A. Yes, sir.

"Q. How did he do?

"Objection by Mr. Miller.

\*　　\*　　\*　　\*　　\*　　\*　　\*　　\*

"Q. What was his conduct there? What was it?

"A. Well, he looked in the window.

"Q. State whether or not he staggered, whether or not you saw him stagger?

"Objection by Judge Scott.

"Objection sustained as to the form of the question.

"The Court: How old are you, Sarah?

"A. Eleven.

"The Court: When is your birthday?

"A. August 31st.

"Mr. Barbour: You have stated that he appeared to be drunk. What was it he did that made you think he was?

"A. He staggered and talked like it."

On cross-examination she was asked if she had not made a different statement to Mrs. J. L. Spicer, about a week after the occurrence. She denied having done so. Mrs. Spicer was thereafter introduced as a witness for the plaintiff and testified as follows:

"Q. You are the wife of Mr. Spicer who has already testified in this case?

"A. Yes, sir.

"Q. And live down there near the Mays'?

"A. Yes, sir.

"Q. Do you remember having a conversation with the little girl, Sarah Bennett, about a week afterwards at your house?

"A. Yes, sir.

"Q. And you were asking about what she saw?

"A. Yes, sir.

"Q. Will you tell the jury whether she said that she saw Mr. Swan go into the pump house?

"A. She certainly did. She told me she saw Mr. Swan go in the pump house, and she saw him get down on his knees and look under the lathes; saw him get on top of the engine and look over; she heard Mrs. May screaming; she got nervous and took Sonny Bob and ran.

\* \* \* \* \* \* \* \*

"Q. Mrs. Spicer, were you in the witness room yesterday or day before yesterday, when the little girl was there?

"A. Yes, sir.

"Q. Did you hear her statement?

"A. Yes, I certainly did.

"Q. Did she then state the same thing you have already testified to?

"A. Yes, sir.

"Q. Did she then state anything about running away, and shaking the door?

"Mr. Miller: Put it in a specific question.

"Q. Didn't she say he got up from the floor and got on the engine?

"A. Yes, sir, she certainly did.

"Q. And he was shaking the door and she left and ran for help?

"A. Yes, sir.

"Q. She said that?

"A. Yes."

There was no cross-examination of the witness.

No effort was made to impeach the reputation of Mrs. Spicer for truth and veracity, nor was there any evidence offered by defendant to sustain the general reputation of Sarah Bennett for truth and veracity. However, over the objection of the plaintiff, the court permitted the defendant to introduce B. S. Bennett, the father of Sarah Bennett, and allowed him to testify as follows: "I went home and asked her about it; said she was down at Mr. May's; I asked her if Mr. Swan was there; said yes, Mr. Swan came in there. I asked her who was with him; said she did not know, some man driving. I asked what he did; said drove up there and stopped and asked for Mr. May, and she said she sent one

of the little boys she was playing with over to ask Mrs. May, and the little boy came back, and she told Mr. Swan that Mr. May was not there, and said Mr. Swan said he would like to speak to Mrs. May, and she told him Mrs. May was in the shower bath, taking a shower, and then she said Mr. Swan got out and staggered on over to the door and started in the door, and said Mrs. May *hollered* out there and told him Mr. May was down in the garden. Said Mr. Swan asked her to go down there and tell Mr. May to come up there; said she went down there and back; I asked her, 'Where was Mr. Swan when you got back?' Said he was out by the car, and I asked her where Mrs. May was. Said Mrs. May was going to the house, and she heard Mrs. May say something about a gun. That was all she said; exactly like she stated on the stand; exactly what she stated to Mr. Miller the first morning."

In overruling the objection of counsel for the plaintiff that the evidence was inadmissible, the court said, in substance, that while in some of the States the rule permitting the introduction of such evidence prevailed, that in Virginia the general rule is to the contrary, and then added: "I am of opinion that under the special circumstances here as to the testimony of this child, the court should admit the statements made out of court by the child shortly after the occurrence. The court is going to admit it."

This action of the court is assigned as error.

■■ It is inferable from the remarks of the learned trial court that the court was of opinion that the evidence was inadmissible but that on account of the tender years of the witness, the court had the right to exercise a discretion in the matter. If such a view was entertained, it is untenable. The competency of a witness may be and usually is a question addressed to the sound discretion of the trial court whose action is subject to review. But the admissibility of evidence, whether it emanates from an infant or an adult, depends not upon the discretion of the court but upon sound legal principles. If this were not true, the court, in the exercise of a conceived discretion in a case like the case at

bar, could indefinitely prolong a trial by admitting alleged corroborative evidence in support of every witness who had made a prior statement. Though but eleven years of age, the quoted evidence, *supra,* demonstrates that Sarah Bennett was an intelligent witness and that her testimony was in great part the supporting beam on which rested the case of the defendant.

 It is a matter of common knowledge, especially in the school room, that precocious children eleven years of age can and do establish a good or bad reputation for truth and veracity. Therefore, when they are offered as witnesses, and their competency established, they stand upon no higher ground than any other witness.

It has never been contended, so far as we are advised, that the rights of a litigant should be determined by matters of expediency or consideration for the feelings of a witness. Every litigant is entitled to have his case determined according to established rules of law and evidence. That the rule as to the admissibility of corroborative evidence is firmly established in Virginia admits of no argument.

The conclusive expression of this court on the question is found in *Repass* v. *Richmond, et al.,* 99 Va. 508, 39 S. E. 160, 162. It appears in that case that "A. R. Willard, one of the defendants, testified on the trial of the issue out of chancery that the bond upon which he was sued as one of the sureties of the deputy treasurer was not filled up when he signed it. By cross-examination and otherwise, an effort was made to show that this statement was in conflict with his conduct and admissions prior to that time, and that his present claim and statement that the bond was blank when he signed it, and the name of the obligee and conditions therein were afterwards inserted, was an afterthought. To corroborate Willard's statement, appellees were permitted to prove by Isaac N. Huddle that he had heard Mr. Willard say about six years before that the bond was blank when he signed it." The admission of Huddle's testimony was the error assigned. In holding that the evidence was inadmissible, Judge Buchanan said:

■ "It is a general and well-nigh universal rule that evidence of what a witness said out of court cannot be received to corroborate his testimony. 1 Greenleaf on Ev., section 469; *Howard* v. *Com.*, 81 Va. [488] 489, 490.

"The only exception to this rule given by Mr. Greenleaf is that, where a design to misrepresent is charged upon the witness in consequence of his relation to the party or the cause, it may be shown that he made a similar statement before that relation existed. 1 Greenleaf on Ev., section 469.

"Mr. Phillips, after stating the general rule, says that in one point of view a former statement by the witness appears to be admissible in confirmation of his evidence, and that is, where the counsel on the other side impute a design to misrepresent from some motive of interest or relationship; there, indeed, in order to repel such an imputation it might be proper to show that the witness made a similar statement at a time when the supposed motive did not exist, or where motives of interest would have prompted him to make a different statement. 2 Phillips on Ev., 974.

"Mr. Starkie says it is agreed that such evidence may, under special circumstances, be admitted, as, for instance, in contradiction of evidence tending to show that the account was a fabrication of late date, and where, consequently, it becomes material to show that the same account has been given before its ultimate effect and operation, arising from a change of circumstances, could have been foreseen. 1 Starkie, Ev., 149.

"Mr. Taylor, in his work on Evidence (vol. 2, section 1476), says that such evidence is not admissible unless the witness be charged with 'a design to misrepresent in consequence of his relation to the party or the cause, in which case it may be proper to show that he has made a similar statement before that relation existed.' See, also, *Howard* v. *Com., supra; Ellicott* v. *Pearl*, 10 Peters [412] 415, 9 L. Ed. 475; *Robb* v. *Hackley*, 23 Wend. [N. Y.] 50; 1 Whart. Ev., section 570."

■■ No contention is made by counsel for defendant that Sarah Bennett bore any "relation to the party or the

cause." Nor is it shown that plaintiff's counsel attempted to show that the witness was actuated by malice against the plaintiff or was improperly influenced by the defendant to testify in his favor. Some of the cases hold that where a direct attempt is made to show malice or improper influence, then such corroborative evidence is admissible. See *Howard* v. *Commonwealth,* 81 Va. 488, 490.

Though it is true that the jury found a verdict for the plaintiff, yet we are unable to say that the *quantum* of damages has no relation to the testimony of the witness Sarah Bennett. Unless it plainly appears that such improper evidence did not affect the jury in the assessment of damages, we cannot say that the parties have had a fair and impartial trial.

We are not unmindful that several other assignments of error are relied upon, but in view of our conclusion to reverse the judgment of the trial court and award a trial *de novo,* we do not deem it essential to discuss them.

*Reversed.*