## 𝔖𝔱𝔞𝔲𝔫𝔱𝔬𝔫

FRED A. HAYCOX, ALBIN R. MAILHES, AND THE BEACH PUBLISHING
CORPORATION, A VIRGINIA CORPORATION v. J. WILLCOX DUNN.

September 10, 1958.

Record No. 4799.

Present,      *, and Spratley, Buchanan, Miller, Whittle and Snead, JJ.

* Note: Former Chief Justice Hudgins sat during the argument of this case and
before his death concurred in this opinion.

The opinion states the case.

*William L. Parker* (*Richard B. Kellam*, on brief), for the plaintiffs in error.

*James E. Heath* (*M. Earl Woodhouse*, on brief), for the defendant in error.

SPRATLEY, J., delivered the opinion of the court.

This is a motion for judgment instituted by J. Willcox Dunn, alleging the publication by defendants, Fred A. Haycox, Albin R. Mailhes, and The Beach Publishing Corporation, of common law libel and insulting words under our statute. (Virginia Code, 1950, § 8-630.) The action is based on two publications appearing in the "Virginia Beach Sun-News," one on November 24, 1955, and the other on December 8, 1955.

Dunn is the editor and publisher of a weekly newspaper called "Princess Anne Free Press," published at Virginia Beach, in Princess Anne County, Virginia. Mailhes is vice-president, general manager, and editor of the "Virginia Beach Sun-News," also a weekly newspaper, published by The Beach Publishing Corporation, at Virginia Beach. Fred A. Haycox, Richard B. Kellam, and Mailhes own all of the stock of the corporation. The directors are those three shareholders and Sidney S. Kellam. Both newspapers are circulated in the City of Norfolk, Virginia, and the surrounding territory.

The defendants filed grounds of defense and amended grounds of defense, asserting the truth of the publications complained of, alleging they were made in self-defense, and denying malice. They charged that the plaintiff, as editor and publisher of the "Princess Anne Free Press," constituted himself the spokesman of a political faction in Princess Anne County and Virginia Beach, opposed to the group holding office in said County and City, for the purpose of increasing the circulation of his newspaper, and with intent to deceive its readers. They listed a number of the issues of plaintiff's paper containing statements reflecting on the character and integrity of the defendants, their friends and associates.

The trial, by jury, resulted in a verdict in favor of the plaintiff, Dunn, for $65,000, which the court reduced to $30,000, over the objection of the plaintiff, and entered judgment accordingly.

The trial of the case consumed six days, and the record consists of more than six hundred typewritten pages.

The defendants assign error to the admission in evidence of a part of the record of the proceedings in an action instituted by Vito Morlino against The Free Press, Incorporated, and J. Willcox Dunn, in the Circuit Court of Princess Anne County and subsequently transferred to the Court of Law and Chancery of the City of Norfolk; to the action of the court in granting Instructions P-1 and P-5 requested by the plaintiff; to the refusal of the court to grant Instruction D-3 as offered by defendants; to the refusal of the court to set aside the verdict and order a new trial; to the action of the court in reducing the amount of the verdict instead of setting it aside, and to the amount of damages as excessive.

The plaintiff assigns cross-error to the action of the court in reducing the award of the jury and refusing to enter judgment upon the verdict of the jury.

In view of the conclusion which we have reached, it is only necessary for us to consider defendants' assignments of error relating to the admission of evidence, and to the court's action in granting and refusing instructions. In connection therewith, we shall recite and refer to only so much of the evidence as is necessary to present a picture of the situation which brought on the controversy between the parties, and is related to the above assignments.

In 1952, Dunn began publication of the "Princess Anne Free Press," and started a vigorous crusade to correct what he termed "corruption" in connection with the administration of public office in

Princess Anne County and Virginia Beach. He charged, from time to time, that the majority of the officeholders of those communities were guilty of malfeasance and misfeasance in office and of association with criminals and racketeers; and that they and the defendants were guilty of corrupt and improper motives. He branded defendants as members of the "Kellam Machine," and charged that members of that group had infiltrated every organization in Princess Anne County and Virginia Beach, social, civic, religious and political, and had given loyalty to the "Kellam Machine" above loyalty to their communities, their clubs or societies. He directed his attacks largely against Floyd E. Kellam, Judge of the Circuit Court of Princess Anne County, Sidney S. Kellam, a brother of Judge Kellam and a business and political leader of that County, other members of the Kellam family, and their friends and associates.

In the November 17, 1955, issue of the "Princess Anne Free Press," there was spread across the entire front of the first page a headline, in bold letters, reading as follows:

"EX-FUGITIVE SPOT FERGUSON GUNS IN SIDNEY KELLAM BLIND."

Immediately following, in large type, appeared the following three lines:

"ELUSIVE RACKETEER SHOOTS
IN 'KELLAM PARTY' GROUP;
RIDES IN 'EROSION' JEEP."

Underneath this statement then appeared the following:

"City Sergeant Halstead 'Spots' Ducking Pal."

"With that fantastic twist for which Princess Anne is becoming noted, the notorious racketeer and Kellam Machine politician, Spot Ferguson, shot ducks on November 8' from a blind licensed by Sidney S. Kellam, brother of Circuit Court Judge Floyd E. Kellam, from whose court Ferguson has been a recent fugitive under special grand jury indictments.

\*    \*    \*    \*    \*    \*    \*

"Virginia Beach City Sergeant Hal Halstead at dawn of last Tuesday week was seen driving with Ferguson towards the ducking area. The authority for Ferguson to shoot from Sidney Kellam's blind was indicated on its schedule as 'Kellam party.'

"On the first day of the season Spot Ferguson, Charles McChesney, father of Assistant City Sergeant, Buddy McChesney, and City Ser-

geant Halstead are known to have used as transportation to and from the ducking area at Back Bay a Virginia Beach Erosion Commission jeep. * * *"

Then followed charges of criminal activities against "Spot" Ferguson and several others, and the statement that Ferguson "allegedly was involved in the reported $7500 loss in 1952 at the Dunes Club," a club involved in charges that it had been operated unlawfully.

In the November 24, 1955, issue of the "Virginia Beach Sun-News," one of the publications complained of, there appeared a headline across the entire front page, reading as follows:

" 'DUNN A FUGITIVE FROM TRUTH'—FERGUSON."

Beneath this appeared the heading:

"NEWSPAPER STORY WASN'T FACTUAL;
'DELIBERATE FALSEHOOD' CHARGED.
Halstead Also Denies Report."

Then, in the column, below the above heading, appeared the folowing:

" 'Willie Dunn is a fugitive from the truth.' So said F. D. 'Spot' Ferguson as a result of an article published last week in the Princess Anne Free Press, a newspaper in which J. Willcox Dunn is listed as publisher.

"The controversial newspaper story stated that Ferguson had hunted ducks in a blind at Back Bay licensed by Sidney S. Kellam, local business executive and recognized political leader in Princess Anne County.

"Ferguson made a statement to the Sun-News in which he stated that he had never in his life been in Sidney Kellam's duck blind and that he had never sought permission to hunt from the blind.

"The article also stated that City Sergeant H. E. Halstead had accompanied Ferguson on the ducking party to the celebrated blind and that the affair was a 'Kellam party.' This prompted a statement from City Sergeant Halstead this week which brands the newspaper story as a 'deliberate lie' and further points up the 'caliber of man Dunn is.'

"Both statements this week point out the gross falseness of the Free Press story.

"Ferguson's statement follows:

" 'Willie Dunn is a fugitive from the truth. I have never been in Sidney Kellam's duck blind in my life. I have never sought permission to hunt in this blind and permission to do so has never been

offered to me by anyone. I hate to bring myself down to Dunn's level but I am compelled to say he is a deliberate liar.' "

\* \* \* \* \* \* \*

"City Sergeant Halstead said:

" 'It has come to my attention that in the November 17 issue of the Princess Anne Free Press a statement was printed to the effect that "Spot" Ferguson and myself, along with another person, shot ducks on November 8th from a blind licensed by Sidney Kellam. This is a deliberate lie. On the date of November 8th General Hugh Harris and myself used this blind through the courtesy of R. R. McChesney. "Spot" Ferguson has never been in this blind to my knowledge. He certainly has never been in it with me. While I am sure the people are familiar with the caliber of man Dunn is I feel compelled to point out what a deliberate lie this is.

" 'I may not agree with Ferguson's philosophy of a livelihood, but man for man I think it is generally conceded that Ferguson is a better man than Willie Dunn.' "

In the issue of December 1, 1955, the "Free Press," in a headline across the front page, Dunn replied:

"SUN-NEWS MUST RETRACT DUNN STORY OR FACE LIBEL SUIT."

Underneath appears the following:

"FREE PRESS ADAMANT;
WON'T TOLERATE HEDGING;
BACK UP OR GET READY."

Then in two columns, entitled "Duck Blind Affair," were repeated the statements made in the November 17 issue of "Free Press" and in an adjoining column the statement of the "Sun-News" of November 24, 1955, above set out.

In the right-hand column of the "Free Press," this statement was made:

"The Virginia Beach Sun-News in its next issue must unequivocally and completely retract the story which appeared in its November 24, 1955 edition banner-lined 'Dunn A Fugitive From Truth'-Ferguson or face a libel suit. The Free Press and its publisher J. Willcox Dunn demand that the retraction story be given prominence equal to that of the one of last week or all parties legally responsible for the Sun-News' original story will be subject to appropriate court action.

"The ducking incident must be resolved.

"For the convenience of our readers we are reprinting on this page our story of Spot Ferguson (ex-fugitive from the jurisdiction of the Circuit Court of Princess Anne) recently gunning in Red Head Bay from a duck blind, licensed by Sidney S. Kellam, brother of Floyd E. Kellam Circuit Court Judge of Princess Anne County.

"The Sun-News story of the following week appears beside that of the Free Press."

In the December 8, 1955, issue of the "Virginia Beach Sun-News," the second publication complained of, there appears on page 4, next to the editorial column, under the heading, "Around the Cracker Barrel," the following statement:

"Last week Old Willie Dunn, in his usual attempt to sell his newspaper, headlined the fact that the Sun-News must retract a story concerning the 'duck blind episode' or face a libel suit. The original story of the duck blind was published by Willie and the Sun-News feels the duck blind episode was resolved when 'Spot' Ferguson said: 'Willie Dunn is a fugitive from the truth.' The Sun-News is inclined to believe Ferguson ahead of Willie and his newspaper since both Willie and his paper have survived thus far on lies. Willie stated that the Sun-News must 'back up or get ready.' Since we don't back up we must be ready."

The written, signed statements of Ferguson and H. E. Halstead, City Sergeant of Virginia Beach, referred to in the "Sun-News" of November 24, were introduced in evidence.

In addition, a number of issues of the "Free Press" dating from January 8, 1954, to February 19, 1956, containing statements charging corruption and improper motives on the part of the officeholders of Princess Anne County and Virginia Beach, supporters of the "Kellam Machine," including the defendants, were introduced in evidence. In the issue of January 7, 1954, the defendant, Haycox, was referred to as a "robber baron," and in its issue of November 18, 1954, as dominated by machine politics. In the last mentioned issue the defendant, Mailhes, was said to be "the general manager of the machine dominated newspaper," that is, the "Sun-News," and other persons, including friends, associates and members of the Kellam family and supporters of the so-called "Kellam Machine" were described as being "always ready to stand up and be counted—sometimes apparently more than once." In its issue of February 9, 1956, it published an editorial headed, "Kellam Machine Blacks Out Justice at

Virginia Beach." Under this statement, it attacked certain proceedings in the Police Court of Virginia Beach as like unto the courts of "Communist Russia, Nazi Germany, and Fascist Italy," and charged that the Commonwealth's Attorney and ex-Commonwealth's Attorney, and the brother of the Circuit Court Judge of Princess Anne, an attorney, teamed up to pull through a so-called trial without regard to law and justice.

In its issue of July 21, 1955, referring to the "Kellam Machine's" victory in the July 12 primary, "as surprising," it was stated that irregularities were practiced at Virginia Beach precincts, and that "shenanigans" went on around the ballot box aided by "shock troops" and "racketeers" associated with the "Kellam Machine." There were also included statements of threats and physical attacks upon Dunn, and charges made that the trial of his alleged attacker was held in an irregular and improper manner.

The record is replete with extraneous matter, with objections to the admission of evidence, and with repeated objections by counsel for each of the parties to the admission of testimony and exhibits. It is clear from the record, as the trial judge stated during the course of the proceeding, that "The whole case from beginning to end is political."

It appeared that in his opening statement to the jury in this case, one of counsel for defendants said: "The jury will want to know why this law suit was brought in the City of Norfolk and not in Princess Anne County, where the parties reside and are known." No further reference was made to this question by counsel for the defendants until the closing argument, when this was said: "The plaintiff did not see fit to bring this case in Princess Anne County where everybody knew him."

The first reference to this subject in the testimony occurred when counsel for the plaintiff said: "Mr. Parker made a remark about your bringing this law suit in Norfolk. Why did you bring it here?" The answer was: "Because I didn't have the slightest idea that I could get a fair trial in Princess Anne County." On cross-examination of Dunn, no reference was made to this question; and it was not until Dunn was recalled and reexamined that the following question was asked by his own counsel: "Now, Mr. Dunn, I understood you to say to Judge Parker that you felt confident that you could not obtain a fair trial in Princess Anne County. Is that correct?" The answer was: "That is right, or words to that effect." The record

does not show that counsel for defendants, referred to as "Judge Parker," asked such a question. After the above answer, counsel for plaintiff offered in evidence a transcript from the record of the proceedings in the case of Morlino against Dunn and "The Free Press, Incorporated," tried in the Court of Law and Chancery of the City of Norfolk. Defendants promptly objected on the ground that the motion and affidavit were purely self-serving declarations.

Then followed considerable argument before the court. Heath, counsel for Dunn, argued that "Judge Parker has gone into it. I want to show why it is true." Heath then asked the witness, "Have you formerly said to the Circuit Court of Princess Anne County it is impossible for you to have a fair trial in that County?" Dunn replied: "I have." Parker then renewed his objection to the introduction of a written paper and in response to his objection the court said to Heath: "He has answered the question. You could, if you saw fit, say why he said that, but that is a self-serving paper you have in your hand." Nevertheless, counsel for plaintiff persistently argued that the court should permit the introduction of the document and counsel for the defendants continued to object. Then Heath again offered the motion and affidavit, and thereupon the following colloquy ensued:

"Mr. Heath: I offer this motion, sir, which has come from the Clerk's Office across the way with the order.

"The Court: He has testified as to the fact that the Judge, upon that motion, transferred it to another Court. What do you want to put that in for? If there was any doubt there it would be different.

"Mr. Heath: I want this jury to know Mr. Dunn has offered to prove in that County the reasons why he can't get a fair trial, and I want him to have the opportunity for the jury to know what he said in that motion.

"The Court: The witness testified that the Judge did transfer it, and I suppose it was disposed of in that Court.

"Mr. Heath: I want to read this to the jury, what he stated.

"The Court: It is a record of the Court of Law and Chancery?

"Mr. Heath: Yes, sir.

"Mr. Parker: It is an effort to sling more mud which this plaintiff has been slinging during the time he has published the paper. It emanates from him, and he wants to lift himself by his own boot straps by offering the document."

The court then said: "The fact that you opened the door as to his bringing it here in this Court and all of that has no place in this case.

"The basis of this controversy is an action for libel as to statements published, that the statements published were libel *per se*, and you have other defenses. To tell us about another Judge has nothing to do with this."

Heath replied: "Judge Parker opened the door."

Later on the court said, with reference to Dunn's statement of his reason for not bringing the case in Princess Anne, and in response to the above statement of Heath, that "It is opened, and closed by his giving his reasons why. Why do you want something like that put in evidence?"

Counsel for plaintiff continued his efforts to put the motion and affidavit in evidence, on the theory that since the document came from a court of record, it was admissible.

Thereupon the following occurred:

"Mr. Heath: Judge Parker asserted that this is an effort to spread or sling mud. It is an effort to let the jury know he has been before the Court like a man and told him these are the reasons why he cannot get a fair trial in Princess Anne County, 'You are head of the organization and picked the Jury Commissioners,' and to show the jury he is not up here to evade anything, but he has faced the Judge of the Court and offered to prove why he could not get a fair trial in Princess Anne County.

"The Court: Do you have a copy of the order?

"Mr. Heath: Yes, sir.

"The Court: If it is based on his written motion it can be put in.

"Mr. Heath: I apologize for being excited.

"The Court: This says that 'The Judge of this Court, not desiring to preside at the trial of this case, doth transfer same to the Court of Law and Chancery of the City of Norfolk, Virginia, and directs the Clerk of this Court to deliver the papers to the Court of Law and Chancery of the City of Norfolk.' There is nothing in that that he acted on this petition. If he was acting on a written motion, it should be entered.

"Mr. Heath: I assure you this was the only motion before the Court.

"Mr. Kellam: The Judge, on his own motion, may transfer any case to another Court, and the order so shows.

"The Court: If he acted on a motion it should be before the jury."

Defendants objected on the ground that it "is a self-serving declaration and its sole purpose is to inflame and prejudice the jury, and has nothing to do with the issue in this case," and noted an exception to the ruling of the court.

The transcript in question, consisting of a motion, an affidavit, and the court orders thereon from an action originally instituted in the Circuit Court of Princess Anne County, and subsequently transferred to the Court of Law and Chancery of the City of Norfolk, in which Vito Morlino was plaintiff and The Free Press, Incorporated, and J. Willcox Dunn were defendants, was then read to the jury, in form and language as follows:

"The defendants and each of them move this honorable court that this action be transferred from this court to another court of the Commonwealth of Virginia having jurisdiction to hear and determine it, upon the ground that the defendants and neither of them can obtain and have a fair and impartial trial by jury in this court. And for grounds in support of this, their motion, the defendants allege as follows:

"1. There exists and has long existed in the County of Princess Anne and in the City of Virginia Beach a political combination, commonly called the Kellam Machine or Kellam Organization led by Floyd E. Kellam who is and since 1946 has been Judge of this Court, Sidney S. Kellam who was for many years Treasurer of said County, Richard B. Kellam and a number of their brothers.

"The combination includes among its chief lieutenants and zealous partisans Clarence E. Hobeck, formerly Chief of Police of the County of Princess Anne and the Town of Virginia Beach; Jim Ed Moore, Chief of Police of Princess Anne County; Fred A. Haycox, Cecil H. Reed and E. B. McCoy, sometime members of Special Grand Juries attending this Court; Paul W. Ackiss who is, and for many years has been Commonwealth's Attorney for Princess Anne County; John V. Fentress, Clerk of this Court; Ivan G. Mapp, Commissioner of the Revenue of Princess Anne County and Jonathan D. Vaughan, Treasurer of Princess Anne County.

"2. The combination commonly called the Kellam Machine or Kellam Organization includes among its zealous partisans substantially all of the public officers and employees of the County of Princess Anne and the City of Virginia Beach.

"3. The Jury Commissioners appointed by this Court for 1954

are zealous partisans of the combination commonly called the Kellam Machine or Kellam Organization.

"4. The combination commonly called the Kellam Machine or Kellam Organization includes among its zealous partisans numerous persons who are active participants in illegal activities.

"5. The combination commonly called the Kellam Machine or Kellam Organization is, and for many years has been in control of the Democratic Party in the County of Princess Anne and the City of Virginia Beach and of all of its official bodies, boards and committees and of all Boards of Election in said County and City.

"6. The combination commonly called the Kellam Machine or Kellam Organization, through its leaders, lieutenants and zealous partisans owns, controls, or substantially influences many commercial, civic and charitable enterprises, organizations and associations in the County of Princess Anne and in the City of Virginia Beach including the only locally owned bank, the only locally owned Building and Loan Association, and the only locally owned newspaper, except the defendant, 'Princess Anne Free Press.'

"7. The combination commonly called the Kellam Machine or Kellam Organization through and by means of the power and influence of its leaders, lieutenants and partisans individually and collectively who occupy the said offices, serve on the said Boards, bodies and committees, are employed by said county and city, own, control, or substantially influence said enterprises, organizations and associations, and who engage in said activities, has, and has long had great economic and political power and influence in Princess Anne County and the City of Virginia Beach.

"8. The combination commonly called the Kellam Machine or Kellam Organization has on numerous occasions used and abused its great power and influence to favor its adherents and to intimidate, injure and oppress its opponents.

"9. For many years and particularly since 1949, J. Willcox Dunn, defendant herein, a native of Virginia and longtime resident of Virginia Beach, has been a close observer and student of the operations of the Kellam Machine and of the administration, and maladministration of public offices and affairs and particularly of the administration of justice by leaders, lieutenants and partisans of the said combination commonly called the Kellam Machine or Kellam Organization, and by persons under their domination and control.

"Beginning in 1949 the said J. Willcox Dunn began publicly to

criticize actions and omissions of certain of the leaders, lieutenants and partisans of the combination commonly called the Kellam Machine or Kellam Organization and of certain persons under their domination and control and to bring to public attention the evils and abuses flowing therefrom. In March, 1952, J. Willcox Dunn began and has since continued to publish each week the newspaper 'Princess Anne Free Press.' In seeking to fulfill the obligation of said 'Princess Anne Free Press' to inform the public on matters of public concern and to perform its duty to its subscribers and readers he has in news items and editorials in said newspaper reported, discussed, commended, criticized and censured certain of the acts and omissions of public concern of certain of the leaders, lieutenants and partisans of the combination commonly called the Kellam Machine or Kellam Organization. In so doing, he has from time to time and in many issues of the 'Princess Anne Free Press' strongly assailed the said Floyd E. Kellam, Sidney S. Kellam, Clarence E. Hobeck, Jim Ed Moore, Paul W. Ackiss, John V. Fentress, Ivan B. Mapp and other leaders, lieutenants and partisans of said combination and other persons under its domination and control.

"10. As a result of his said criticisms and censures of leaders, lieutenants and partisans of the combination commonly called the Kellam Machine or Kellam Organization, and although the said criticisms and censures were fully justified and warranted by the facts, they, the said leaders, lieutenants and partisans of the said combination named in said newspaper reports and editorials, are and have been intensely hostile to the said J. Willcox Dunn and they harbor feelings of malice and ill-will towards him and do constantly seek by word of mouth and by writing to influence others to feel hostility towards him and to speak derogatorily of him.

"11. Partisans of the said combination commonly called the Kellam Machine or Kellam Organization have made threats against the said J. Willcox Dunn, declaring in effect that they would 'get' him if he did not 'lay off' and cease his criticisms and censures of them.

"12. Partisans of the said combination commonly called the Kellam Machine or Kellam Organization desire to silence the newspaper, the 'Princess Anne Free Press' and to silence its publisher, the said J. Willcox Dunn; and a trial of this action in Princess Anne County will provide them with an opportunity to try to accomplish these ends.

"13. WHEREFORE, and for the reasons stated herein the defendants and each of them alleges that neither of them can have and obtain a fair and impartial trial by jury in the County of Princess Anne; and this they allege to be true whether a jury be drawn from the said County or from elsewhere.

PRINCESS ANNE FREE PRESS, INCORPORATED
By (S) J. WILLCOX DUNN--PRESIDENT."

"Pursuant to Rule 3:18 of the Supreme Court of Appeals of Virginia, the defendants made this pleading an affidavit by the following statement under oath:

*     *     *     *     *     *     *

"The defendants and each of them move that the Judge of this Honorable Court, Floyd E. Kellam, do disqualify himself to sit as Judge in this action on the ground that he is biased and prejudiced against the said defendants and each of them.

"The Judge of this Court not desiring to preside at the trial of this case, doth transfer the same to the Court of Law and Chancery of the City of Norfolk, Virginia, and directs the Clerk of this Court to deliver the papers to the Clerk of the Court of Law and Chancery of the City of Norfolk, Virginia, forthwith.

A Copy--Teste: JOHN V. FENTRESS, Clerk
By (S) R. H. WEST,
Deputy Clerk."

Plaintiff contends, in support of the court's ruling, that defendants' counsel, in his opening statement, before the evidence was heard, made an attack upon Dunn by imputing that Dunn had such a widespread bad repute among the citizens of his home county that his testimony would not be accepted by a jury in that county, that doubts were cast upon the truth of Dunn's statements, and that since the motion and affidavit were a part of the record of a court proceeding, they were admissible as evidence of the prior consistent statements of the witness, Dunn, who had been sought to be impeached by the imputation of misrepresentation.

None of the defendants in the present case had any connection with the action instituted by Morlino against Dunn and his newspaper in the County of Princess Anne and subsequently transferred to the Court of Law and Chancery of the City of Norfolk. There was no issue in the pleadings in this case as to why Dunn brought

it in the City of Norfolk. He had the right to institute it in any court having jurisdiction of the subject matter and the parties. His answer to the question, why he brought it in the City of Norfolk, and not in Princess Anne County, was full, direct and responsive. The motion and affidavit consist of a summary of the charges of corruption, malfeasance and misfeasance, which Dunn had published from time to time concerning the defendants, the officeholders of Princess Anne County and Virginia Beach, their friends and associates.

Whether or not Dunn could get a fair trial in Princess Anne County in the case instituted by Morlino against him, or in this case instituted by him against the defendants, was not in issue in the present case, and had no part or connection therewith.

The motion and affidavit were plainly self-serving declarations. They pictured Dunn as a zealous crusader striving to protect the public from misdeeds and corruption alleged to have been committed by the so-called "Kellam Machine," and as one earnestly engaged in an effort to obtain and preserve justice, law and order. The affidavit charged that the Kellam organization was engaged in illegal actions and unlawful machinations, and was being supported by persons under its complete domination and control. The transcript, with the orders of the court included, might well have influenced the jury in the present case to believe that the Court of Law and Chancery had found that the charges made in the affidavit had been established as true in a court proceeding.

It is conceded that the affidavit formed no part of the *res gestae*. It is insisted, however, that counsel for defendants "opened the door" to its admission by the imputation of misrepresentation by Dunn. The contention is without merit. After plaintiff had fully disposed of the question why he brought the case in the City of Norfolk, it was his counsel who subsequently opened the subject and not the defendants.

There were no imputations in the statements or questions by defendants' counsel that Dunn had made prior inconsistent statements or misrepresentations as to whether or not he could get a fair trial in Princess Anne County. There were no charges or imputations that he had made different statements about the defendants at any former time. There was no effort to contradict or impeach the witness, or to show a misrepresentation of his attitude or views towards defendants.

■ In 7 Michie's Jurisprudence, Evidence, Sec. 255, page 632, is the following apt summary of the rule adopted in Virginia:

"*Self-Serving Declarations.*—It may be stated generally that a party's declarations are not admissible as evidence in his own favor unless they form a part of the *res gestae.* But to come within the terms and operation of the general rule stated above, the declarations must accompany and explain an act done, which is a fact in issue, or is relevant to the issue. Accordingly, it has been held that the declarations of a party in his own favor ought not to be received as evidence, though it is a part of the *res gestae* of a collateral fact introduced in the case, merely to contradict a witness on the other side, but which fact is in no way otherwise connected with the material inquiry involved in the case.

"Self-serving declarations made by one party in the absence of the other, should not be admitted in evidence; and if such declarations inadvertently creep into the evidence before the jury, they should be stricken out on motion, and the jury told to disregard them.* * *"

In 20 Am. Jur., Evidence, § 458, pages 404, 405, this is said:

"Testimony may be inadmissible as hearsay, notwithstanding it is the declaration of the witness upon the stand. Thus, a self-serving declaration, offered at the trial for the purpose of fortifying the witness's own testimony, is inadmissible. Prior statements of a witness are not admissible in corroboration of his testimony, at least until an attack has been made on his credibility.* * *"

See also for further application of the doctrine: *Scott and Boyd* v. *Shelor,* 28 *Gratt.* (69 Va.) 891, 896, *Repass* v. *Richmond,* 99 Va. 508, 39 S. E. 160; *Mopsikov* v. *Cook,* 122 Va. 579, 95 S. E. 426; *Crowson* v. *Swan,* 164 Va. 82, 178 S. E. 898; and *Sutton* v. *Sutton,* 194 Va. 179, 187, 72 S. E. 2d 275.

The admission of the record from the Court of Law and Chancery of the City of Norfolk was reversible error. The motion and affidavit constituted self-serving declarations in an issue not involved in or connected with the inquiry in this proceeding. They presented to the jury statements calculated to prejudice them against the defendants, and which may have readily affected the finding of the jury, both as to the liability of the defendants and the amount of assessment of damages against them.

■ Defendants objected to Instructions P-1 and P-5 on the ground that there was no actual malice shown by the evidence, and on the

further ground that Instruction P-5 disregarded the defense of privilege.

Without reciting the evidence relating to malice, in view of the fact that the case must be remanded for a new trial, we think that the words used, under the circumstances recited, were sufficient to submit to the jury the question whether or not defendants were actuated by actual malice.

Instruction P-5 deals only with one aspect of the case, that is, whether, upon the failure of the defendants to sustain their plea of truth they were further shown to have been actuated by actual malice; whereas, defendants also relied upon the privilege of self-defense in the protection of their interests.

Paraphrasing the language of *Chaffin* v. *Lynch*, 84 Va. 884, 886, 6 S. E. 474, the question for the jury was not solely whether the language used was true, or whether defendants had reasonable ground to believe it to be true, but whether in point of fact they honestly believed it to be true, and published it without malice, in fair self-defense, or in the reasonable protection of their own interests.

Instruction D-3, as requested by defendants, was first granted by the court and later refused. It reads as follows:

"The Court instructs the jury that if they believe from the evidence that the plaintiff caused to be published charges of disreputable conduct by any of the defendants, or any other person, or characterized them in such a manner as to bring them into disrepute by publishing derogatory statements concerning them, then the persons so charged are entitled to defend themselves against the charges made against them, and any publication so made in self-defense, if made *bona fide* and without malice, is privileged, because made in the performance of a moral duty. It is true that one insult cannot be set off against another, yet if a man is attacked in a newspaper, he may reply; and if his reply is not unnecessarily defamatory of his assailant, and is honestly made in self-defense, it will be privileged, and no recovery may be had based thereon. The Court further instructs the jury that it is the duty of the Court to determine whether or not the occasion is privileged, and it is the duty of the jury to determine whether or not the privilege has been abused. The Court instructs you that in the instant case the facts establish that the occasion is a privileged one and that in order to establish that the privilege has

been abused the burden rests upon the plaintiff to establish abuse of privilege by a preponderance of the evidence."

In *Bragg v. Elmore*, 152 Va. 312, 325, 326, 147 S. E. 275, we stated:

"The general rule, which has been repeatedly stated by this court, is that it is the court's duty to determine as a matter of law whether the occasion is privileged, while the question of whether or not the defendant was actuated by malice, and has abused the occasion and exceeded his privilege are questions of fact for the jury. (Citing cases.)

"There can be no doubt whatever as to this rule. It has been so correctly stated in the cases cited and many others. The case, however, illustrates a qualification of that rule. Generally, all the facts in connection with the actual publication of the libelous language are apparent. This was true in the precedents we have cited. Occasionally, however, cases arise in which, because of sharp and substantial conflicts in the testimony as to the facts upon which the claim or privilege rests, the question as to whether the particular occasion was privileged becomes a mixed question of law and fact."

The instruction is correct from a legal standpoint; but it is calculated to mislead the average layman, such as a juror, because of its failure to define what constitutes an abuse of privilege. It is true that actual malice to the extent defined in Instruction P-5 constituted an abuse of privilege; but, as we have stated, that instruction deals only with one aspect of the case, and there was no other instruction which defined the privilege of self-defense.

The case does not come within the exception mentioned in *Bragg v. Elmore*, supra. There are no "sharp and substantial conflicts in the testimony as to the facts upon which the claim or privilege rests." On the other hand, the facts and circumstances surrounding the publications of the defendants appear to be without dispute.

The question of privilege was one for the court, and the question of the use which the defendants made of their privilege, that is, whether they acted maliciously or not, was a question for the jury to decide. 12 M. J. Libel and Slander, § 23, pages 72 *et seq.*

In *Chaffin v. Lynch*, 83 Va. 106, 1 S. E. 803, beginning on page 117 of 83 Va., this is said:

"The reported cases on the subject of privileged communications are very numerous, and they show that while the law as to such communications is well settled, its application to particular cases is often attended with difficulty. They also show that the law in this par-

ticular was formerly more restricted than at present, the rule having been gradually extended, on the ground that it is to the interest of society that correct information should be obtained as to the character and standing of persons with whom others have business or social relations; so that it is now settled, as laid down by Baron Parke in the leading case of *Toogood* v. *Spyring*, 1 C. M. & R. 181, that a communication honestly made in the performance of a social duty, is no less privileged than one made in self-defense, or in the protection of one's own interest. And a communication made under such circumstances, and without malice, is protected, notwithstanding its imputations be false, or founded upon the most erroneous information. (Citing a large number of cases.)

"According to these principles, while it is true that one insult cannot be set off against another, (*Bourland* v. *Eidson* 8 Gratt. 27,) yet if a man is attacked in a newspaper, he may reply; and if his reply is not unnecessarily defamatory of his assailant, and is honestly made in self-defense, it will be privileged. The rule, deducible from the authorities, is expressed by a modern text-writer as follows: 'Every man has a right to defend his character against false aspersion. It may be said that this is one of the duties that he owes to himself and to his family. Therefore, communications made in fair self-defense are privileged. If I am attacked in a newspaper, I may write to that paper to rebut the charges, and I may at the same time retort upon my assailant, when such retort is a necessary part of my defense, or fairly arises out of the charges he has made against me.' Odgers, Lib. and Sland. 228."

The judgment in the above case having been reversed and remanded came on again to be heard on a writ of error to the second judgment of the trial court. *Chaffin* v. *Lynch*, 84 Va. 884, 6 S. E. 474. The second judgment was reversed for failure of the trial court to instruct the jury in conformity with the general principles laid down in the first appeal as applicable to the case. There the court said that one "honestly defending his character against false aspersion, his communication, if within the limits of the occasion, is protected, because made in the performance of a moral duty." 84 Va., page 889.

In *Israel* v. *Portland News Pub. Co.*, 152 Or. 225, 232, 53 P. 2d 529, 103 A. L. R. 470, the principle involved is stated as follows:

"The law seems to be well settled that when one is attacked by

defamatory matter published in the press one may resort to the same methods to reply to or rebut the charges made."

Then quoting from Newell, Slander and Libel, 4th Ed., Sec. 429, page 456, this is said:

" 'Every man has a right to defend his character against false aspersion. It is one of the duties which he owes to himself and to his family. Therefore, communications made in fair self-defense are privileged. If a person is attacked in a newspaper, he may write to the paper to rebut the charges, and may at the same time retort upon his assailant, where such retort is a necessary part of his defense or fairly arises out of the charges he has made. A man who commences a newspaper war cannot subsequently come to the court as plaintiff to complain that he has had the worst of the fray. But in rebutting an accusation the party should not state what he knows at the time to be untrue, or intrude unnecessarily into the private life or character of his assailant. The privilege extends only to such retorts as are fairly an answer to the attacks.' "

In *Conroy* v. *Fall River Herald News Pub. Co.*, 306 Mass. 488, 28 N. E. 2d 729, 132 A. L. R. 927, the court held that one who is defamed is privileged in branding, in good faith, the defamatory statements as false and calumnious; and if his motives are impugned may comment upon the motives of his defamer.

"One attacked by a slander or libel has a right to defend himself, but he has no right to turn his defence into a slanderous or libelous attack, unless it clearly appears that such attack was necessary for his justification." *Borley* v. *Allison*, 181 Mass. 246, 247, 63 N. E. 260.

"Statements made in an honest endeavor to vindicate one's character or to protect one's interests are usually regarded as qualifiedly privileged, even though they are false, if they are made in good faith and without malice. Thus, it seems to be definitely settled that when one person assails another in the public press, the latter is entitled to make reply therein, and so long as the reply does not exceed the occasion, he cannot be held responsible for any resultant injury." 33 Am. Jur., Libel and Slander, § 134, page 133.

"The law justifies a man in repelling a defamatory charge by a denial or by an explanation, and, if he answers the charge in good faith, and what he publishes is fairly an answer, and is published for the purpose of repelling the charge and not with malice, it is privileged." 53 C. J. S., Libel and Slander, § 111, page 189.

See Odgers, Libel and Slander, 6th Ed., pages 240-242; Newell,

Libel and Slander, 4th Ed., § 429, page 456; 1 Harper and James, The Law of Torts, page 401.

We are, therefore, of opinion that both instructions P-5 and D-3 are objectionable for the reasons stated.

It is not likely that the questions contained in the remaining assignments of error will be raised upon a new trial; and we, therefore, refrain from discussing them.

For the reasons stated, the judgment of the trial court is reversed, the verdict of the jury set aside, and the case remanded for a new trial, in accordance with the views herein expressed.

*Reversed and remanded.*